USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 95-2301 EDWARD A. McGRATH, Plaintiff, Appellant, v. THE RHODE ISLAND RETIREMENT BOARD, ETC., Defendant, Appellee. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ronald R. Lagueux, U.S. District Judge] ___________________ _________________________ Before Selya, Cyr and Boudin, Circuit Judges. ______________ _________________________ Edward C. Roy, Jr., with whom Roy & Cook was on brief, for ___________________ __________ appellant. David D. Barricelli, with whom Hinckley, Allen & Snyder was ___________________ _________________________ on brief, for appellee. _________________________ July 9, 1996 _________________________ SELYA, Circuit Judge. This appeal requires us to SELYA, Circuit Judge. ______________ determine whether a legislated change to a substantive provision of a public employees' retirement plan, as applied, transgresses the Contracts Clause of the United States Constitution. We find no constitutional infraction: plaintiff-appellant Thomas McGrath's pension rights had not yet vested when the modification occurred, and the state had reserved the power to alter or revoke its promise of retirement benefits to municipal employees at the time it established the plan in which McGrath later became a participant. Consequently, we affirm the district court's grant of summary judgment in favor of defendant-appellee Rhode Island Retirement Board (the Board). I. THE STATUTORY SCHEME I. THE STATUTORY SCHEME The Rhode Island General Assembly established a state employees' retirement plan in 1936. See 1936 R.I. Pub. Laws, ch. ___ 2334 (codified at R.I. Gen. Laws 36-8-1 to 36-10-39 (1990 Reenactment & Supp. 1995)). In 1951, the General Assembly enabled Rhode Island's cities and town to enroll their employees in a matching plan. See 1951 R.I. Pub. Laws, ch. 2784 (codified ___ at R.I. Gen. Laws 45-21-1 to 45-21-62 (1991 Reenactment & Supp. 1995)). The legislature patterned the municipal employees' plan (MEP) after the state employees' plan (SEP), engrafting the former onto the latter. Together, these plans comprise what is familiarly known as the state retirement system. The key provisions of both plans are ordained by statute and both are administered under the aegis of the Board.  2 The law authorizing the MEP affords each of Rhode Island's thirty-nine municipalities the option of deciding whether or not to participate. See R.I. Gen. Laws 45-21-4. If ___ a city or town chooses to join, its eligible employees are required to become members of the plan and must contribute six percent of salary until they have reached the maximum amount of service credit attainable. See id. 45-21-41. Municipalities ___ ___ may elect to defray some or all of their employees' required contributions to the MEP. See id. 45-21-41.1. ___ ___ A qualified employee is entitled to a life annuity upon retirement in the amount of two percent of his or her final salary times the number of years of total creditable service (up to thirty-seven and one-half years). See id. 45-21-17. A ___ ___ person is eligible to retire with such a pension once he or she attains age fifty-eight and has logged at least ten years of total creditable service. See id. 45-21-16. Under this ___ ___ formulation the only formulation that is germane to this case1 a municipal member's right to a pension vests when he or she meets both the age and years-in-service minima. The MEP gives members the opportunity to purchase up to four years of pension credits for temporally equivalent active duty military service. See id. 45-21-53. A member also can ___ ___ purchase pension credits for any "prior service with the city or  ____________________ 1Under the MEP, a worker also is eligible to retire with a similarly calculated pension regardless of age if he or she accumulates at least thirty years of total creditable service. See R.I. Gen. Laws 45-21-16. ___ 3 town of which the employee is now employed." Id. 45-21-9(b). ___ Prior to 1991, these purchased credits benefitted a plan participant in two ways. First, they served to increase the life annuity payments that would be payable upon the participant's retirement. Second, they served to accelerate the participant's vesting date. For example, an individual who had served four years in the military could purchase four years of creditable pension time at a relatively modest rate and then retire at age fifty-eight after only six years of municipal employment. What is more, the individual would receive an annuity upon retirement in the amount of two percent of his or her final salary times ten years (despite having worked for a mere six years). From its very inception, the statute that paved the way for municipal employees to enter the state retirement system included a provision reserving the state's power to amend the terms of the municipal members' participation. We reproduce this escape clause in its entirety: Reserved power to amend or repeal Vested Reserved power to amend or repeal Vested rights. The right to amend, alter, or rights.  repeal this chapter at any time or from time to time is expressly reserved, and in that event the liability of the municipal employees' retirement system of Rhode Island shall be limited[,] in the case of a member or a person claiming through the member[,] to the contributions made by the member, without interest, and in the case of a municipality, to contributions made by the municipality[,] without interest, subject to deductions prescribed in the case of withdrawal by a municipality as provided in 45-21-6. All retirement allowances or other benefits granted by the retirement of members, and in force prior to a repeal or amendment, shall be vested in the beneficiaries thereof and 4 shall be paid in full in accordance with the terms of this chapter, and the rights of the retirement board to compel the payment by any municipality of the sum or sums necessary to provide the retirement allowances granted to members formerly employed by the municipality shall not be affected by the repeal or amendment. Id. 45-21-47. Under this provision, the state reserves the ___ authority to make changes to the pension plan, up to and including the termination of municipal participation and the elimination of the pension rights of all employees (except those who have already retired). Upon repeal, current employees would receive back nothing more than the contributions they had made over the course of their employment, without interest. See id. ___ ___ For many years the state retirement system was plagued with problems. In 1991, with tales of suspected pension abuse rampant, the General Assembly restructured the system in several respects. Among other changes, the legislature revised the method for calculating the minimum years of service (ten) required before an employee of suitable age could retire with a pension. The new method focused on actual time in service without regard to purchased credits. It did so by designating contributing membership (i.e., the period of time during which an employee had been working for the public employer and making contemporaneous contributions to the system) as the virtually exclusive measure of creditable time for vesting purposes. The new law stated: Except as specifically provided in 36-10- 9.1, 36-10-12 through 36-10-15 and 45- 21-19 through 45-21-22 of the general laws, 5 no member shall be eligible for pension benefits under this chapter unless the member shall have been a contributing member of the employees' retirement system for at least ten (10) years. Provided, however, a person who has ten (10) years service credit shall be vested. Any person who becomes a member of the employees' retirement system pursuant to 45-21-4 shall be considered a contributing member for the purposes of title 45, chapter 21 and this chapter. R.I. Gen. Laws 36-10-9(c) (Supp. 1993) (enacted June 16, 1991). It is readily evident that, under the amendment, an employee may only count years of actual service for purposes of meeting an applicable ten-year vesting requirement. Thus, purchased credits (for, say, time in the military) can no longer be counted toward vesting (unless the holder comes within the "grandfather clause" protecting persons who already had logged ten years of total creditable service, including the purchased credits, at the effective date of the statutory change).2 In enacting this statute, the General Assembly amended only Title 36 the law creating the SEP. Nevertheless, as the last sentence of the excerpted language indicates, the change seemed to apply to the MEP as well. When the Board exhibited some confusion about which minimum vesting requirement applied to municipal members, the legislature moved swiftly to dispel all doubt by amending Title 45 the law creating the MEP to make  ____________________ 2The new provision did not affect the use of purchased credits in regard to the thirty-year vesting alternative, see ___ supra note 1, or in regard to pension augmentation. Thus, the _____ purchase of military credits still could yield a significant monetary return when the Board, at retirement, applied the statutory formula to compute the amount of a participant's yearly annuity. 6 it pellucid that municipal members, like other participants in the system, must have been contributing members for at least ten years in order to meet the minimum years-in-service requirement for a pension. See R.I. Gen. Laws 45-21-16(b) (enacted July ___ 21, 1992). The new law ceded substantially the same grandfathering to members who already had accumulated ten years of total service (including purchased credits), see id., but it ___ ___ did not extend the same unguent to persons who had bought credits but had not yet, even with the aid of those credits, cleared the years-in-service hurdle. II. THE COURSE OF EVENTS II. THE COURSE OF EVENTS The relevant facts underlying this litigation are not in dispute. Thomas McGrath began working for the City of Cranston as a probationary employee on April 9, 1986. His probationary status ended six months later. Because Cranston had elected to participate in the system, he became a contributing member of the MEP on November 28, 1986. He remained in that status until April 28, 1994 (although Cranston defrayed some of the contribution costs). In February 1991 the appellant began pursuing the purchase of retirement credits for two and one-half years of prior military service. Applying the statutory formula (ten percent of first-year salary for each year of surrogate credit purchased) the Board informed the appellant that he could buy the desired credits for $4,316.09, and that for the added sum of $917.53 he could purchase credits corresponding to his six-month 7 probationary period. The appellant bought the credits on April 15, 1991. At that time he had been a contributing member of the system for just over four and one-half years. As the law then read, the appellant's purchase of surrogate credits worked to his advantage in two ways. First, the purchase augmented his anticipated pension benefit by increasing the number of years that would form the basis on which his yearly retirement annuity would be calculated. Second, the purchase promised to accelerate vesting and enable him to retire with a pension after completing a mere seven years of actual municipal employment. The appellant claims that he planned to take advantage of both attributes and to retire from municipal service late in 1993 (at which time he would be beyond the minimum retirement age). While the 1991 and 1992 amendments to the law did not diminish the appellant's prospects of boosting his pension by reason of the purchased credits, they dashed his hopes of accelerated vesting.3 Under the new law, only years in which municipal employees had been contributing members could be counted toward the vesting requirement. Because the appellant had only nine years, two months and twenty-two days of total creditable service (including purchased credits) when the 1992 amendment took effect, he lost the benefit of the accelerated  ____________________ 3This case does not require us to speculate whether the 1991 amendment in and of itself dictated this result. Even if the MEP was unaffected until the General Assembly acted in 1992, the outcome here would be the same. 8 vesting that he had envisioned. McGrath met with a representative of the state retirement system in October 1993 to ascertain whether the new law would be applied to the determination of his pension eligibility. After receiving an adverse decision, he petitioned the Board. The Board ruled that under the amended statute he could use the purchased probationary credits toward vesting, but that he could not use the purchased military credits for that purpose. Accordingly, the Board decreed that the appellant would not vest unless he continued in municipal service through April 9, 1996. Put another way, the appellant would have to work a full ten years for Cranston before becoming eligible to receive a pension. Should he reach that milestone, the purchased military credits would be applied to augment the amount of his yearly retirement annuity and he would retire with twelve and one-half years of credited service (rather than ten), thus allowing him to receive a more munificent pension. The appellant resigned his municipal office on April 28, 1994. The Board stood fast, taking the position that he was not entitled to any pension but merely to a return of contributions (including the payments tendered for the purchased credits). Pensionless but undaunted, McGrath brought suit against the Board in the United States District Court for the District of Rhode Island. He alleged that the amendment to R.I. Gen. Laws 45-21-16, as applied to him by the Board, transgressed the Contracts Clause, see U.S. Const. art. I, 10, ___ 9 the Equal Protection and Due Process Clauses, see U.S. Const. ___ amend. XIV, 1, and the Takings Clause, see U.S. Const. amend. ___ V.4 In a thoughtful opinion, the district court granted brevis ______ disposition in the Board's favor. See McGrath v. Rhode Island ___ _______ ____________ Ret. Bd., 906 F. Supp. 749 (D.R.I. 1995). This appeal ensued. ________ III. ANALYSIS III. ANALYSIS In this forum, the appellant challenges only the lower court's rejection of his Contracts Clause claim. We restrict our analysis accordingly. A A In terms, the Contracts Clause prohibits states from passing "any . . . Law impairing the Obligation of Contracts." U.S. Const. art. 1, 10. Though the Framers apparently had in mind only purely private contracts (particularly debt obligations), see Benjamin F. Wright, Jr., The Contract Clause of ___ ______________________ the Constitution 15-16 (1938), the Clause routinely has been _________________ applied to contracts between states and private parties. See, ___ e.g., Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 137-39 (1810). ____ ________ ____ Over time, the Supreme Court has devised a tripartite test for use in analyzing alleged impairments of contracts. See ___ General Motors Corp. v. Romein, 503 U.S. 181, 186 (1992). Under ____________________ ______ this paradigm, a court first must inquire whether a contract exists. If so, the court next must inquire whether the law in question impairs an obligation under the contract. If so, the  ____________________ 4This provision is made applicable to the states through the genius of the Fourteenth Amendment. See Webb's Fabulous ___ ________________ Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 160 (1980). ________________ ________ 10 court then must inquire whether the discerned impairment can fairly be characterized as substantial. Affirmative answers to these three queries compel a court to abrogate the proposed application of the challenged state law. See id. ___ ___ It should be noted that this tripartite test actually has a fourth component. In an appropriate case the model expands to include an inquiry as to whether the impairment, albeit substantial, is reasonable and necessary to fulfill an important public purpose. See Energy Reserves Group v. Kansas Power & ___ ______________________ _______________ Light, 459 U.S. 400, 411-12 (1983). If so, the challenged law _____ will not be held to infringe rights secured by the Contracts Clause. See id. Furthermore, when a state is itself a party to ___ ___ a contract, courts must scrutinize the state's asserted purpose with an extra measure of vigilance. See United States Trust Co. ___ _______________________ v. New Jersey, 431 U.S. 1, 25 (1977). Because this fourth __________ component requires careful judicial scrutiny in all events, it is clear that a state must do more than mouth the vocabulary of the public weal in order to reach safe harbor; a vaguely worded or pretextual objective, or one that reasonably may be attained without substantially impairing the contract rights of private parties, will not serve to avoid the full impact of the Contracts Clause. B B In general, retirement plans are within the reach of the Contracts Clause. To be sure, noncontributory pensions were viewed a century ago not as contracts but as mere gratuities. 11 See, e.g., Pennie v. Reis, 132 U.S. 464, 471 (1889). But times ___ ____ ______ ____ have changed, and evolving legal doctrine recognizes that the promise of a pension is part of the compensation package that employers dangle to attract and retain qualified employees. In line with this evolving doctrine we have held that, in general, pensions are to be regarded as a species of unilateral contracts. See Hoefel v. Atlas Tack Corp., 581 F.2d 1, 4-5 (1st Cir. 1978) ___ ______ ________________ (explaining that "the promise of a pension constitutes an offer which, upon performance of the required service by the employee[,] becomes a binding obligation"), cert. denied, 440 _____ ______ U.S. 913 (1979). Other courts have come to view pension plans in much the same way. See, e.g., Pratt v. Petroleum Prod. Mgmt., ___ ____ _____ _______________________ Inc. Employee Sav. Plan & Trust, 920 F.2d 651, 661 (10th Cir. _________________________________ 1990) (stating that a "pension plan is a unilateral contract which creates a vested right in those employees who accept the offer it contains by continuing in employment for the requisite number of years") (quoting Hurd v. Illinois Bell Tel. Co., 234 ____ _______________________ F.2d 942, 946 (7th Cir.), cert. denied, 352 U.S. 918 (1956)); see _____ ______ ___ generally Arthur L. Corbin, Corbin on Contracts 2.29, at 256 _________ ____________________ (Joseph M. Perillo rev. ed. 1993). Though the principle that a pension plan represents an implied-in-fact unilateral contract is fairly well settled and has been applied repeatedly to state and municipal pension plans,5 there is significant disagreement about when  ____________________ 5Our opinion in Hoffman v. City of Warwick, 909 F.2d 608 _______ _______________ (1st Cir. 1990), does not subvert this principle. Hoffman _______ involved a Rhode Island law that granted veterans additional 12 contractually enforceable rights accrue under such plans. See, ___ e.g., Nevada Employees Ass'n, Inc. v. Keating, 903 F.2d 1223, ____ ______________________________ _______ 1227 (9th Cir.) (suggesting that nonvested employees have contractual rights subject only to "reasonable modification"), cert. denied, 498 U.S. 999 (1990); Betts v. Board of Admin. of _____ ______ _____ ___________________ the Pub. Employees' Ret. Sys., 582 P.2d 614, 617 (Cal. 1978) (en _____________________________ banc) (stating that the right to a "substantial" or "reasonable" pension accrues on first day of employment); Petras v. State Bd. ______ _________ of Pension Trustees, 464 A.2d 894, 896 (Del. 1983) (explaining ____________________ that rights accrue when vesting occurs); Singer v. City of ______ ________ Topeka, 607 P.2d 467, 475 (Kan. 1980) (similar to Petras, but ______ ______ adding that rights remain subject to "reasonable modification"); Sylvestre v. State, 214 N.W.2d 658, 666-67 (Minn. 1973) (taking _________ _____ the position that an employee's rights accrue on first day of employment); Baker v. Oklahoma Firefighters Pension & Ret. Sys., _____ __________________________________________ 718 P.2d 348, 353 (Okla. 1986) (holding that rights accrue only when an employee vests); Leonard v. City of Seattle, 503 P.2d _______ ________________ 741, 746 (Wash. 1972) (en banc) (similar to Baker). And, _____ moreover, some courts cling to the notion that a state-sponsored retirement plan for public employees creates no enforceable contractual rights whatever. See, e.g., Pineman v. Oechslin, 488 ___ ____ _______ ________  ____________________ seniority in public employment. The state had never enforced the law, and there was no indication that employees knew about it, much less considered it part of their employment arrangement. See id. at 612. On those idiocratic facts, we concluded that the ___ ___ statute did not evince a legislative intent to contract, and that a fortiori its repeal did not impair contractual obligations owed _ ________ to current employees. See id. at 614. Fairly read, Hoffman does ___ ___ _______ not stand for the proposition that statutory employment benefits can never create contractual rights. 13 A.2d 803, 809-10 (Conn. 1985); Spiller v. State, 627 A.2d 513, _______ _____ 516 (Me. 1993). C C Rhode Island's municipal employees' pension system differs from the plans that have been considered by other courts in at least one material respect: R.I. Gen. Laws 45-21-47 explicitly reserves to the legislature the power to amend or terminate the plan, including the power to eliminate pension benefits entirely (except for those employees who have already retired).6 It is generally the case with supposed unilateral contracts that if the offeror expressly reserves the power to revoke the offer until the offeree's performance is complete, then the offer is illusory and cannot give rise to a unilateral contract. See Restatement (Second) of Contracts 45, cmt. b ___ (1981) ("A reservation of power to revoke after performance has begun means that as yet there is no promise and no offer."). The Supreme Court has endorsed this approach in respect to certain  ____________________ 6Of course, it can be argued that a legislatively-created pension plan is always subject to amendment by means of further ______ legislative enactments, whether or not the plan explicitly reserves a power to amend. We caution that this may be too simplistic an argument. The Contracts Clause prohibits a state legislature from amending any law in a way that works a substantial impairment of contractual obligations previously undertaken. An explicit reservation easily can be understood as a legislative effort to avoid creating a contractual obligation in the first place, for when the state expressly reserves the power to withdraw or reconfigure the promise of a pension, a state employee who thereafter accepts employment will be hard- pressed to assert a reasonable basis for relying on the original promise. Viewed in this light, the very existence of the Contracts Clause seems to give a state's explicit reservation of authority to amend its own public employee pension law more bite than an inchoate power to amend can command. 14 federal employee retirement benefits. See United States R.R. ___ ___________________ Ret. Bd. v. Fritz, 449 U.S. 166, 174 (1980) (stating that _________ _____ statutory "railroad [retirement] benefits, like social security benefits, are not contractual and may be altered or even eliminated at any time"). If this logic holds, the Rhode Island municipal retirement system seemingly does not produce the kind of binding offer that courts are likely to enforce. Yet this logic is not inevitable. In the wide world of employee pension plans, the principle that reserved power to revoke means that there is no offer and no contract has not been applied consistently. In Allied Structural Steel Co. v. ______________________________ Spannaus, 438 U.S. 234 (1978), the Court held that a state law ________ impaired the obligations of Allied Steel's preexisting contract with its employees by requiring that all employer-provided pension plans must include certain guarantees. See id. at 250. ___ ___ En route to this holding the Court recognized the existence of a contract for Contracts Clause purposes notwithstanding the fact that the employer-sponsor had explicitly reserved the right to amend or terminate its pension plan even if doing so meant depriving employees (including those employees who had already vested) of their expected benefits. In the same vein, prior to the enactment of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. 1001-1461 (1994) a statute that now occupies much of the field in the law of pension benefits, but which has no direct relevance here significant common-law precedent had developed 15 in support of the view that an express and unqualified reservation of the power to amend or terminate a pension plan is only to be given effect up to the point at which an employee's rights under the plan vest. For instance, we held in a pre-ERISA case that retired employees were entitled to benefits as provided in a negotiated pension plan notwithstanding (a) the presence of a clause in the plan reserving to the employer "the right to change, suspend or discontinue the Plan at any time," and (b) the employer's attempted termination of the plan. Hoefel, 581 F.2d ______ at 3-4. In so holding, we observed approvingly that a "number of courts have construed pension plans which reserve to the employer the right to alter or discontinue . . . as limiting the employer's reserved right to apply only to employees whose pension rights had not, at the time of the change, already vested." Id. at 5. Hoefel relied heavily on Cantor v. Berkshire ___ ______ ______ _________ Life Ins. Co., 171 N.E.2d 518 (Ohio 1960), in which the Ohio ______________ Supreme Court ruled that "even though the employer has reserved the right to amend or terminate the plan, once an employee, who accepted employment under such a plan, has complied with all the conditions entitling him to participate in such plan, his rights become vested and the employer cannot divest the employee of his rights thereunder." Id. at 522. Other courts agree. See, e.g., ___ ___ ____ In re Erie Lackawanna Ry. Co., 548 F.2d 621, 625-27 (6th Cir. _______________________________ 1977); Ehrle v. Bank Bldg. & Equip. Corp., 530 S.W.2d 482, 495 _____ __________________________ (Mo. Ct. App. 1975); Stopford v. Boonton Molding Co., 265 A.2d ________ ____________________ 657, 665-66 (N.J. 1970); see generally Annot., 46 A.L.R.3d 464, ___ _________ 16 468-70 (1972) (collecting cases). Thus, the caselaw evinces an emergent common-law rule to this effect: once an employee fulfills the service requirements entitling him or her to retirement benefits under a pension plan, the employee acquires a contractual right to those benefits, and the employer cannot abridge that right despite its aboriginal reservation of a power to effect unilateral amendments or to terminate the plan outright.7 We hasten to add a caveat. To our knowledge, all of the cases that have cabined the effect of an explicitly reserved power to amend involve private-sector retirement plans. It is unclear whether the same limitations apply ex proprio vigore to __ _______ ______ public-sector retirement plans. On one hand, principles of fairness argue for comparability of treatment. On the other hand, the very nature of a republican form of government and that government's unique duty to represent the public interest combine to create a special employment environment. Lawmakers pay homage to this reality in many ways, see, e.g., R.I. Gen. Laws 36-11-6 ___ ____ (1990 Reenactment) (denying most public employees the right to strike), and there are sound policy reasons to recognize this difference in terms of maximizing the states' flexibility vis- - vis the retirement benefits that it offers to public employees.  ____________________ 7Recent legislation buttresses the legitimacy of this rule. ERISA, for example, specifically provides that pension plan amendments cannot decrease retirement benefits which have already accrued. See 29 U.S.C. 1054(g). Similarly, the Internal ___ Revenue Code defines as "qualifying plans" only those pension plans that provide for the protection of "accrued benefits" upon plan termination. 26 U.S.C. 411(d)(3). 17 Indeed, such concerns underlie the recognized presumption that statutory enactments do not create contractual obligations in the absence of an "unmistakable" intent on the legislature's part to do so. See United States v. Winstar, No. 95-865, slip op. at 31- ___ _____________ _______ 48 (U.S. July 1, 1996) (discussing the role of the unmistakability doctrine in "limiting contractual incursions on a State's sovereign powers" under the auspices of the Contracts Clause). Be that as it may, the instant case does not require us to choose between these opposing viewpoints. Even if the common- law rule applies to public employees' retirement plans and the MEP therefore creates an enforceable contract linking the state and the individual MEP members a matter we do not decide it would not assist McGrath. D D The district court found that the appellant's purchase of military credits created a contract between him and the state, separate and apart from the overall agreement to provide a pension. See McGrath, 906 F. Supp. at 760 n.1. Under this ___ _______ separate contract, the state promised to pay McGrath a larger retirement annuity in return for a stipulated cash payment. See ___ id. at 763. Although the purchase yielded a second prospective ___ benefit producing an opportunity for earlier retirement, made possible by the ability to count purchased credits toward the MEP's minimum years-in-service requirement the court thought that this feature was merely incidental to the essential purpose of the separate contract. See id. at 763-64. Partly because ___ ___ 18 R.I. Gen. Laws 45-21-47 rendered the appellant's reliance on the state's ancillary promise unreasonable, and partly because the amendment to R.I. Gen. Laws 45-21-16 did not impair the "central undertaking" of the contract pension augmentation  the court concluded that the amendment comprised only an "insubstantial" impairment of the separate contract and therefore did not transgress the Contracts Clause. See McGrath, 906 F. ___ _______ Supp. at 766 (citing City of El Paso v. Simmons, 379 U.S. 497, ________________ _______ 514 (1965)). Although we uphold the district court's judgment we arrive at that destination by a somewhat different path. For purposes of Contracts Clause analysis, as in contract law generally, it serves no legitimate end to slice and dice unitary agreements into a series of fragmentary subcontracts. Cf. Smart ___ _____ v. Gillette Co. Long-Term Disab. Plan, 70 F.3d 173, 179 (1st Cir. __________________________________ 1995) (warning that "[a]ccepted canons of construction forbid the balkanization of contracts for interpretive purposes"). To the contrary, a singular contract should be treated as such. Applying this salutary principle, we think it is unrealistic to view the acquisition of surrogate credits as forming a separate and distinct contract. In point of fact, the purchase constitutes no more than a transaction made available under the auspices of the overall retirement arrangement.8 Hence, the rights created by the purchase of credits are subsumed within,  ____________________ 8As the district court recognized, the only rights conferred by the purchased credits were rights within the MEP itself. See ___ McGrath, 906 F. Supp. at 759. _______ 19 and indistinguishable from, the rights created under the retirement plan proper. We must, therefore, train our sights on the MEP as a whole. Based on the authorities canvassed above, we believe that the architecture of the MEP at most extends an offer of a unilateral contract to employees of participating municipalities, subject, however, to the reserved powers contained in R.I. Gen. Laws 45-21-47. Assuming, for argument's sake, that such a contract has significance for purposes of the Contracts Clause  a matter on which we take no view it nonetheless is clear that, under the contract terms, a member's rights to a retirement annuity are not secure until he or she has met the age and service requirements established in the plan (and, therefore, has become vested).9 Until such time, section 45-21-47 permits the state to make modifications to, or even terminate, members' rights under the plan without offending the Contracts Clause. And, moreover, since rights gained by service and rights gained by purchase are "equal in stature" within the system, McGrath, _______ 906 F. Supp. at 759, it follows that both are equally subject to the state's reserved power to amend or terminate whatever presumptive entitlements an unvested member may from time to time look forward to enjoying. In terms of this case, then, the appellant's purchase  ____________________ 9It is unclear whether the legislature can pass and lawfully enforce an amendment that adversely affects an individual who has satisfied the age and years-in-service requirement, but has not yet retired. This case does not present an appropriate occasion for us to explore this terra incognito. _____ _________ 20 of surrogate credits may have conferred certain rights on him, but it did so only against the backdrop of the state's reserved authority to modify those rights up to the point of vesting (if not beyond). And since McGrath was not vested when the Rhode Island General Assembly revised the MEP, his claim founders. To say more would be supererogatory. We conclude that the amendment to R.I. Gen. Laws 45-21-16, as applied, passes constitutional muster under the Contracts Clause. See City of ___ _______ Charleston v. Public Serv. Comm'n, 57 F.3d 385, 393-95 (4th Cir.) __________ ___________________ (holding that a state law did not impair a public contract when the contract expressly stated that its terms were subject to legislative regulation), cert. denied, 116 S. Ct. 474 (1995); _____ ______ National Ass'n of Gov't Employees v. Commonwealth, 646 N.E.2d ___________________________________ ____________ 106, 110 (Mass.) (holding that a statutorily mandated increase in state employees' health insurance premiums did not impair a public contract because the legislature had expressly reserved the power to change the contract's terms), cert. denied, 115 S. _____ ______ Ct. 2615 (1995). IV. CONCLUSION IV. CONCLUSION We need go no further. As between Rhode Island and the appellant, the 1992 amendment to R.I. Gen. Laws 45-21-16 did not impair any obligation protected by the Contracts Clause. Consequently, the district court appropriately entered judgment for the Board. Affirmed. Affirmed. ________ 21