USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1763
No. 98-1782

 NATIONAL EDUCATION ASSOCIATION-RHODE ISLAND,
 BY ITS SECRETARY, TIA SCIGULINSKY, ET AL.,

 Plaintiffs, Appellees/Cross-Appellants,

 v.

 RETIREMENT BOARD OF THE RHODE ISLAND
 EMPLOYEES' RETIREMENT SYSTEM, ET AL.,

 Defendants, Appellants/Cross-Appellees.
 __________

 RICHARD R. DeORSEY,
 
 Plaintiff, Appellant.

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Ronald R. Lagueux, U.S. District Judge]

 Before

 Boudin, Circuit Judge,
 
 Aldrich, Senior Circuit Judge,
 
and Shadur, Senior District Judge.

 Joan McPhee and Neil F.X. Kelly, Special Assistant Attorney
General, with whom John C. Bartenstein, Richard S. Weitzel, Ropes
& Gray, Thomas A. Palombo, Special Assistant Attorney General, and
Jeffrey B. Pine, Attorney General, were on brief for defendants
Nancy Mayer and Retirement Board of the Employees' Retirement
System of the State of Rhode Island and Joann Flaminio in her
capacity as Executive Director.
 Robert H. Chanin with whom John M. West, Jonathan D. Hacker,
Bredhoff & Kaiser, P.L.L.C., Thomas J. Ligouri, Jr., Richard A.
Skolnick and Skolnick, McIntyre & Tate were on brief for plaintiffs
National Education Association-Rhode Island, et al.
 Marc B. Gursky with whom Gursky Law Associates was on brief
for plaintiff Richard R. Deorsey. 
 
 

 

March 24, 1999

 BOUDIN, Circuit Judge. In 1936, Rhode Island created a
retirement system for state employees, school teachers, and other
employees of cities and towns that chose to participate. R.I. Gen.
Laws 36-8-1 to 36-10-39. The retirement system is administered
by the Retirement Board ("the Board"), which is chaired by the
state treasurer. R.I. Gen. Laws 36-8-4, 36-8-9. The retirement
system is a "defined benefit plan" in which benefits are determined
not by the amount contributed during service but by a schedule of
benefits that specifies the amount to be paid.
 At present, benefits under the Rhode Island statute are
set as a percentage of the average of the employee's salary earned
during the three highest consecutive years of earnings, multiplied
by the number of years of credited service. R.I. Gen. Laws 36-
10-10. An employee may retire and begin receiving payments at any
age after 28 years of service or after reaching age 60 and
completing 10 years of service. Id. 36-10-9. Employees
contribute a fixed percentage of annual earnings to the retirement
system, but the state pays the balance needed to provide the
scheduled benefit. Id. 36-10-2.
 In the 1980s, teachers' unions in Rhode Island sought
legislation to allow employees of unions representing state
employees including teachers to participate in the state retirement
system; these union employees are not, at least in that capacity,
public employees. Thus, the statute needed to be amended to permit
them to receive benefits. In early 1987, a bill embodying such a
proposal was introduced and placed on the legislature's consent
calendar; and it was passed on the final day of the session without
debate and apparently without much public notice.
 The new provision, codified at R.I. Gen. Laws 36-9-33, 
not only allowed union employees to join the retirement system, but
also permitted them to purchase credit, on payment of a modest
amount to the system, for all years previously served with the
union. This allowed the union employee to treat all prior years
of employment by the union as years of public service needed to
qualify for state pension benefits and to treat earnings from the
union as if they were public compensation for purposes of computing
the "highest three (3) consecutive years" average. Id. 36-10-10.
 Furthermore, the provision allowed union employees to
receive pension benefits based on salaries over which the state had
no control. Because the retirement system calculates benefits
based on the average of the three highest consecutive years' salary
(multiplied by a factor based on years of service), the union could
raise salaries for pension-qualifying union employees and thereby
boost their pension benefits from the state retirement system. The
record reflects significant increases in union employee salaries
following the passage of section 36-9-33.
 The effect, as more fully described below, was to allow 
a number of highly paid union officials to qualify for state
pensions almost immediately in amounts greatly in excess of their
contributions to the system. The pensions were in addition to, not
in place of, whatever pensions were provided by the union. The
district court later calculated the plaintiffs' total contribution
to the Retirement System at $1,995,784, the present value of their
projected pension benefits at about $11,430,579, and an average
projected rate of return for the individual plaintiffs of
approximately 1250 percent.
 When the situation became widely known, the legislature
repealed section 36-9-33 in toto on June 9, 1988. See 1988 R.I.
Pub. Laws ch. 486 ("the Repeal Act"). At that time, applications
by union employees were pending before the Board, which had
declined to process them. Despite the repeal, two teachers' unions
filed suit in October 1988 and later succeeded in persuading a
state court judge that the repeal was prospective only and did not
permit the Board to exclude union employees who had sought to
become members and purchase credits prior to the repeal. See RIFTv. Retirement Sys., No. PC 88-4974 (R.I. Sup. Ct. Dec. 21, 1989).
 As a result, qualified union employees then entered the
retirement system, some retiring fairly soon after. Bernard
Singleton, for example, became a member of the Retirement System
effective January 1, 1990 (as did other individual plaintiffs) and
promptly purchased roughly 25 years of service credit for his prior
union employment at a cost of $25,411.09. On July 28, 1990,
several months later, at age 52, he took "early retirement" and
immediately began to collect a pension of approximately $53,000 per
year, with an expected lifetime benefit of about $750,000.
 In July 1994, the legislature responded by "evicting" the
union employees. See 1994 R.I. Pub. Laws ch. 413, 1, codified at
R.I. Gen. Laws 36-9.1-l et seq. ("the Eviction Act"). The new
statute, which sparked the present litigation, terminated pensions
for union employees who had entered under the now repealed statute. 
It provided for return of their contributions, with interest,
reduced by any benefits they had received. Id. The Eviction Act
stated that inclusion of union employees had "no rational
relationship to any legitimate governmental purpose" and would
invade the corpus in violation of the requirements of the Internal
Revenue Code. Id. 36-9.1-1.
 Two teachers' unions and 22 present or former union
employees then brought the present suit in the district court in
July 1994 against the Board, its chairperson, and its executive
director. The plaintiffs alleged that the Eviction Act violated
the Contract, Takings and Due Process Clauses of the Constitution,
see U.S. Const. art. I, 10, cl. 1; id. amend. V; id. amend. XIV,
and that under 42 U.S.C. 1983, they were entitled to declaratory
relief, an injunction, restoration of any benefits wrongly
withheld, and attorney's fees. 
 The district court denied the defendants' motion to
dismiss. See National Educ. Ass'n-R.I. v. Retirement Bd., 890 F.
Supp. 1143, 1165 (D.R.I. 1995) ("NEA I"). Following discovery and
cross motions for summary judgment, the district court decided the
heart of the case in a detailed and lucid opinion on August 7,
1997. See National Educ. Ass'n-R.I. v. Retirement Bd. of R.I.
Employees' Retirement Sys., 972 F. Supp. 100 (D.R.I. 1997) ("NEA
II"). The decision resolved all legal issues but reserved for
later disposition a few factual questions as to the status of three
individual plaintiffs.
 In a nutshell, the district court ruled that the Takings
Clause protected the benefits of two groups of plaintiffs: those
who were eligible to retire and had retired by the date of the
Eviction Act (July 15, 1994), and those who were eligible to retire
but were still working as of that date. Three other plaintiffs
who were still working and were not eligible for retirement at the
date of the Eviction Act were held not protected by the Takings
Clause or by the Contract Clause or by substantive due process
concepts. See id. at 114-15.
 Given these legal rulings, the parties then stipulated as
to the status of two of the other remaining plaintiffs--one was
eligible to retire and therefore protected and the other was not--
leaving only one plaintiff (DeOrsey) whose status was contested. 
In April 1998, the district court conducted a bench trial and ruled
that DeOrsey had never been eligible to join the retirement system. 
Thereafter, the district court entered a final judgment in favor of
the eligible plaintiffs and against the ineligible ones. The
defendants now appeal from the first part of the judgment, and the
ineligible plaintiffs, together with DeOrsey, from the second.
 On appeal, our review is de novo as to the legal issues
resolved on summary judgment, see Terry v. Bayer Corp., 145 F.3d
28, 34 (1st Cir. 1998), and for clear error as to the factual
issues resolved at DeOrsey's bench trial. See Williams v. Poulas,
11 F.3d 271, 278 (1st Cir. 1993). We begin with the plaintiffs'
Contract Clause claims, if only because most of the precedent
addresses such cases under this rubric. The claims raise a
difficult set of issues that were expressly reserved in this
court's leading decision in McGrath v. Rhode Island Retirement
Board, 88 F.3d 12 (1st Cir. 1996), further complicated by the
somewhat eccentric facts of this case.
 Pension plans come in all sorts of shapes and sizes but
the typical plan contemplates a stream of payments to be received
by the employee starting upon retirement; both the terms and the
payment formula are normally stated in the plan. In defined
benefit plans, such as that of Rhode Island, the employee may be
required to contribute during employment; but much of the payout is
contributed by the employer, often funded in advance at least in
part. See generally 1 J. Mamorsky, Employee Benefits Law: ERISA
and Beyond 1.01-1.05, at 1-2 to 1-25 (1998).
 Although such plans may be negotiated as explicit
contracts (e.g., as part of a collective bargaining agreement),
quite often they are simply "plans." The plans may or may not have
language binding the employer not to change them (at least in
certain circumstances) or reserving its right to do so (at least in
certain circumstances). Often, such plans have "vesting"
provisions, but strictly speaking such provisions usually 
describe how the existing plan operates and not whether the plan
itself can be altered unilaterally by the employer. "Vesting" and
"contractual" are not synonymous.
 In McGrath, this court surveyed the case law and
concluded that with respect to private pension plans, the courts
were divided, but that a substantial body of case law treats such
plans as implied contracts, protecting at least those whose rights
have "vested." McGrath, 88 F.3d at 16-17. The theory is that the
plan is an offer and the employee, by working for many years
pursuant to the plan, has relied on and accepted the offer, which
cannot now be changed unilaterally as to a vested employee, whether
still working or retired. Id. at 17. Of course, the plan may
still explicitly reserve rights to alter vested benefits.
 The case law concerning public-employee pensions is less
settled. Some courts, including this one, have been quite hesitant
to infer a contract where the state pension statute neither speaks
in the language of contract nor explicitly precludes amendment of
the plan. See, e.g., Parker, 123 F.3d at 5-6. After all,
legislatures regularly modify compensation schedules and benefit
programs. Supreme Court precedent has tended to treat government
pension statutes as similarly subject to modification for payments
not yet made, unless the government's intent to create a contract
is clear and definite. See, e.g., Dodge v. Board of Educ., 302
U.S. 74, 78-79 (1937).
 Thus, 
 absent some clear indication that the
 legislature intends to bind itself
 contractually, the presumption is that 'a law
 is not intended to create private contractual
 or vested rights but merely declares a policy
 to be pursued until the legislature shall
 ordain otherwise.' Dodge v. Board of Educ.,
 302 U.S. 74, 79 (1937). . . . [T]he principal
 function of a legislature is not to make
 contracts, but to make laws that establish the
 policy of the state. . . . Policies, unlike
 contracts, are inherently subject to revision
 and repeal, and to construe laws as contracts
 when the obligation is not clearly and
 unequivocally expressed would be to limit
 drastically the essential powers of a
 legislative body.

National R.R. Passenger Corp. v. Atchinson, Topeka & Santa Fe Ry.
Co., 470 U.S. 451, 465-66 (1985) (emphasis added).
 Although National Railroad involved a claim that federal
statute created contractual rights, the Dodge case cited by the
Court with approval in National Railroad involved a state pension
statute for teachers; and in Dodge the Court explicitly held that
a reduction in pensions for already retired teachers did not
violate the Contract Clause. See Dodge, 302 U.S. at 81. More
recently, the Supreme Court allowed a statutory reduction in
railroad worker pensions for some "vested" workers, noting that
"railroad benefits, like social security benefits, are not
contractual and may be altered . . . ." United States R.R.
Retirement Bd. v. Fritz, 449 U.S. 166, 173 (1980) (citations
omitted).
 The clear statement requirement for "legislative"
contracts has been regularly imposed by the Supreme Court and
followed by this court. The policy reasons for protecting
legislative power against implied surrender are too obvious to
warrant much elaboration, see National Railroad, 470 U.S. at 466;
McGrath, 88 F.3d at 19, and it is easy enough for a statute
explicitly to authorize a contract or to say explicitly that the
benefits are contractual promises, or that any changes will not
apply to a specific class of beneficiaries (e.g., those who have
retired), cf. Parker, 123 F.3d at 8-9.
 We do not think that the Rhode Island general pension
statute "clearly and unequivocally" contracts for future benefits
either by language or--in the circumstances of this case--through
the nature of the relationship. Nowhere does the statute call the
pension plan a "contract" or contain an anti-retroactivity clause
as to future changes. Compare Brand, 303 U.S. at 105. The closest
that the statute comes is a provision headed "Guaranty by state--
Annual appropriations" which provides, inter alia, that 
 it is the intention of the state to make
 payment of the annuities, benefits, and
 retirement allowances provided for under the
 provisions of this chapter and . . . to make
 the appropriations required by the state to
 meet its obligations to the extent provided in
 this chapter. The general assembly shall make
 annual appropriations which shall be
 sufficient to provide for the payment of
 annuities, benefits, and retirement allowances
 required of the state under this chapter.
R.I. Gen. Laws 36-10-7. This certainly directs state officials
to fund the plan as it exists. But it falls at least a step short
of clearly expressing a contractual commitment not to change
benefit levels or other plan variables by legislation. CompareParker, 123 F.3d at 8-9.
 Nor we do think that references in the statute to
"vesting" create a contract. Often, and clearly so in Rhode
Island's statute, "vesting" refers to the period provided by a plan
for which an employee must work to become eligible for a pension if
and when he attains retirement age. See note 1, above. Whether a
plan affords contractual protections against a change in its terms
is a different question. A plan may not protect "vested" employees
against change, see Fritz, 449 U.S. at 169 n.3, 173-74, or
alternatively may provide some contractual protection even for
unvested employees (e.g., against a change in the vesting period),
cf. State of Nevada Employees Ass'n, Inc. v. Keating, 903 F.2d
1223, 1226-27 (9th Cir. 1990). 
 If one turns from language to circumstances, see United
States Trust, 431 U.S. at 17 n.14, it is true that today private
pensions are often conceived and crafted more as deferred
compensation than as gifts. See Parker, 123 F.3d at 6-8; McGrath,
88 F.3d at 16-19. But pensions can still be created (and
withdrawn) without contract; this was just what the Supreme Court
found as to railroad retirement benefits in Fritz itself. SeeFritz, 449 U.S. at 174; see also Hisquierdo v. Hisquierdo, 439 U.S.
572, 575 (1979). Further, Rhode Island's general pension plan was
created in 1936 when the view of pensions taken in Dodge was quite
widespread.
 Rhode Island case law points in both directions. The
state supreme court has implied that under state law pensions
cannot be freely terminated; but it has also allowed cut-offs (of,
for example, a faithless judge) not easily reconciled with a strict
contract theory. See In re Almeida, 611 A.2d 1375 (R.I. 1992). In
all events, whether a contract exists for Contract Clause purposes
is a federal question. See General Motors Corp. v. Romein, 503
U.S. 181, 187 (1992).
 The existence of an employer-employee relationship does
weigh in favor of finding an implied contract, as the non-
governmental pension cases make clear. See McGrath, 88 F.3d at 17
(summarizing case law). However, the force of this consideration
is very much muted in this case: these particular plaintiffs do
not have the benefit of a clear and longstanding employer-employee
relationship with the government--they are far from the
quintessential 10 or 28-years-of-service government employees.
 We decline to decide now whether this last consideration
would tip the balance if, for example, Rhode Island took a meat axe
to the pensions of long-time state employees. In many states,
there are express limitations on such changes; and in general,
political constraints make them unlikely (but not impossible). 
In all events, the clear statement rule is binding unless and until
altered by the Supreme Court, see State Oil Co. v. Khan, 118 S. Ct.
275, 284 (1997); and the conundrum of a "statutory" contract that
may meet this requirement by clear implication rather than clear
language is an issue happily deferred.
 We turn now to the basis given by the district court for
granting relief, namely, that the future payments constituted a
property right that could not be infringed without payment of
compensation to retirees or employees eligible to retire. In
McGrath, we explicitly reserved decision on this issue, seeMcGrath, 88 F.3d at 20 n.9, finding that the pension expectancies
at issue had not even vested at the time that they were modified by
the legislature. Here, the issue can no longer be fully postponed.
 The Fifth Amendment forbids the federal government from 
taking "property" for public use without just compensation, and
this limitation has been extended to the states through the
Fourteenth Amendment. See Webb's Fabulous Pharmacies, Inc. v.
Beckwith, 449 U.S. 155, 160 (1980). What constitutes "property"
for this purpose is a recurring issue to which no mechanical
answer has been found. The concept includes more than tangible
property owned outright, see United States v. Willow River Power
Co., 324 U.S. 499, 502-03 (1945), and has been extended to
materialmen's liens, see Armstrong v. United States, 364 U.S. 40,
44 (1960), and trade secrets protected under state law, seeRuckelshaus v. Monsanto Co., 467 U.S. 986, 1003-04 (1984).
 But the Supreme Court has also made clear that protection
under the Takings Clause does not extend to mere "unilateral
expectation[s]," even if they are entirely plausible expectations
of economic benefit. Webb's Fabulous Pharmacies, 449 U.S. at 161;
cf. Eastern Enterprises v. Apfel, 118 S. Ct. 2131, 2161-63 (1998)
(Breyer, J., dissenting). Thus, the Supreme Court has excluded
from the "property" rubric riparian rights recognized under state
law, railroad pensions, and future social service benefits. Willow
River, 324 U.S. at 502-03 (riparian rights); Hisquierdo, 439 U.S.
at 575 (railroad pensions); Flemming v. Nestor, 363 U.S. 603, 608-
611 (1960) (social security). This is so even though expectations
are sometimes afforded procedural protection, see, e.g., Goldbergv. Kelly, 397 U.S. 254 (1970), and protection from wholly arbitrary
action, see Fritz, 449 U.S. at 172. See R. Rotunda & J. Nowak, 2
Constitutional Law: Substance and Procedure 15.12, at 485 n.4,
 17.5, at 626 (2d ed. 1992).
 In the present case, the Takings Clause does, or arguably
does, to some extent protect some interests of plaintiffs under the
pension plan. Pension payments actually made to retirees become
their property and are protected against takings, even if and where
the payments are unquestionably a gift. Similarly, anything that
the employee contributed, directly or by purchase of benefits, may
well be regarded as the employee's property. Under the Rhode
Island plan, contributions are returned with interest even to a
non-vested employee who leaves the state's employment. See R.I.
Gen. Laws 36-10-8. However, the Eviction Act did not purport to
reclaim any benefits actually paid, and it provided for the return
of any member contributions, with interest, to the extent that they
exceeded already paid-out benefits. See R.I. Gen. Laws 36-9.1-
2(a), (b).
 Thus, the question for us is whether, apart from what has
been paid in by the member or already paid out by the state, the
prospective payments of the state's share of the defined benefits
are currently "property" of the plaintiffs under the Takings
Clause. If there were a contractual right to such payment, that
right itself would be property for the purposes of the Takings
Clause. See United States Trust, 431 U.S. at 11 n.16. But in this
case we have already said that the state's prospective payments,
over and above the members' contributions, are not contractually
obligated under the Contract Clause--at least as to "last minute"
entrants such as the plaintiffs.
 In Hoffman, we concluded that "[n]oncontractual employee
benefits that a recipient has not yet received, but has a mere
expectation of receiving, are not property as to which the
government, before repealing, must provide just compensation." 
Hoffman, 909 F.2d at 616. There we denied a contract clause claim
because a pension statute did not clearly indicate an intent to
bind the legislature contractually, see id. at 614, and then denied
a takings claim because there was no enforceable contract right,
see id. at 616; cf. Fritz, 449 U.S. at 174. That decision is
controlling here.
 This position is virtually compelled by Supreme Court
cases that, after finding that an expected statutory benefit did
not constitute a contract right, rejected the claim to payment. 
See, e.g., National Railroad, 470 U.S. at 466-67, 478-79; Flemming,
363 U.S. at 610-11; Dodge, 302 U.S. at 78-81. It would make
nonsense of such rulings--and the clear intent requirement--to
conclude that an expectancy insufficient to constitute an
enforceable contract against the state could simply be renamed
"property" and enforced as a promise through the back door under
the Takings Clause. 
 This brings us to the final constitutional attack on the 
Eviction Act: the claim that it violates "substantive" due
process. An expectation that is not "property" for purposes of the
Takings Clause may yet sometimes entitle the citizen to procedural
protection, and substantive protection against arbitrariness,
before the expectation is cut off by government action. SeeFlemming, 363 U.S. at 610-11; Hoffman, 909 F.2d at 618. The
plaintiffs' claim here is to substantive protection (no procedural
rights have been denied), but the due process standard in economic
matters is one of minimum rationality. See Usery v. Turner Elkhorn
Mining Co., 428 U.S. 1, 17 (1976); Hoffman, 909 F.2d at 618.
 When Congress curtailed pension rights of certain vested
railroad employees to prevent windfall benefits, it made fairly
mechanical judgments about who should be grandfathered into double
pensions and who should not, and the Supreme Court upheld those
judgments. See Fritz, 449 U.S. at 174, 179-80. Similarly, we only
recently upheld against such an attack certain distinctions made by
Congress in social security payments to limit duplicative recovery,
even while recognizing that the restrictions involved some fairly
gross distinctions that could hardly be described as perfect
justice. See Splude v. Apfel, 165 F.3d 85, 92 (1st Cir. 1999).
 Here, the class of persons who have been "evicted" are
individuals who were never public employees--at least in the
capacity for which the state pensions are sought--and were
permitted to enter the system at bargain-basement prices while
retaining their pensions as union employees. The discrepancies
between what they contributed as a class and what they might expect
in pensions was striking. And almost at once, they were warned of
legislative efforts to undo their unusual benefits. The first such
attempt (the Repeal Act) was frustrated in state court, but the
Eviction Act followed hard on its heels.
 At argument, plaintiffs' counsel pointed out that the
legislature has in the past given special pension benefits to
favored groups, allowing (for example) veterans to "purchase" years
of credit. Cf. McGrath, 88 F.3d at 13 (describing R.I. Gen. Laws 
 45-21-9, 45-21-53). But especially in economic regulation, the
question is not whether the legislature has dealt perfectly with
all possible problems but whether its choice in this instance was
rational. See Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,
467 U.S. 717, 730 (1984); Fritz, 449 U.S. at 176-77; Hoffman, 909
F.2d at 618. Here, the choice to evict this group of members,
returning to them their contributions with interest, is not so
patently arbitrary, irrational, or unrelated to a legitimate
legislative purpose as to constitute a violation of substantive due
process.
 Our resolution makes it unnecessary to discuss whether
the additional plaintiffs, to whom the district court denied
relief, were "eligible" or bona fide members of the plan. It
reserves, once again, the very difficult case of the long-time
vested or eligible employee whose benefits might be curtailed. And
it leaves it open to Rhode Island and its employees to address such
matters by explicit legislation or ordinary contract, the course
best suited to achieve certainty on both sides.
 The decision of the district court is vacated and the
matter is remanded for entry of a judgment dismissing the
complaint.
 It is so ordered.