**Supreme Court**

No. 2017-36-Appeal.
(KC 13-1059)
(formerly PC 13-3212)

Cranston Police Retirees Action Committee　　:

v.　　　　　　　　　　　　　:

The City of Cranston, by and through its　　:
Finance Director Robert Strom and its City
Treasurer David Capuano, et al.

NOTICE:　This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2017-36-Appeal.
(KC 13-1059)
(formerly PC 13-3212)
Concurrence begins on page 48

Cranston Police Retirees Action Committee    :

v.    :

The City of Cranston, by and through its    :
Finance Director Robert Strom and its City
Treasurer David Capuano, et al.

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** This appeal concerns two 2013 Cranston city ordinances that promulgated a ten-year suspension of the cost-of-living-adjustment (COLA) benefit for retirees of the Cranston Police Department and Cranston Fire Department who were enrolled in the City of Cranston's pension plan. The plaintiff, Cranston Police Retirees Action Committee (CPRAC or plaintiff), initiated this litigation against the City of Cranston (the City), Mayor Allan Fung, and the members of the Cranston City Council (collectively, defendants), alleging a litany of claims ranging from constitutional violations to statutory infringements. A Superior Court justice, sitting without a jury in a trial held over six days in November 2015, found in favor of the defendants on all counts. The plaintiff now raises several issues for our consideration related to the trial justice's rulings on an assortment of motions and her findings of fact and conclusions of law. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts

In 1937, the City established a pension fund for members of its police and fire departments. By the mid-1980s, the pension fund had become a significant financial concern. In the early 1990s, Mayor Michael Traficante met with police and firefighter union leaders in an attempt to address the problem. Ultimately, in 1996, the City passed two ordinances based on an agreement reached with the unions, creating a two-tiered pension system (the 1996 ordinances). The 1996 ordinances, No. 96-54 for firefighters and No. 96-56 for police officers, provided that all members of the police and fire departments hired after July 1, 1995, would be enrolled in the state's pension system. Additionally, those members with five or fewer years of service could elect to stay in the City's pension plan or enroll in the state's pension system. For the members remaining in the City's pension plan, the 1996 ordinances provided for a minimum 3 percent compounded COLA, or, alternatively, a percentage equal to that of a contractual increase for active members. The unions bargained for this COLA to match the benefits that were being offered under the state's pension plan.

The fiscal issues related to the City's pension plan did not subside with the passage of the 1996 ordinances. By July 1, 1999, the unfunded accrued liability of the City's pension plan exceeded more than $169 million. The City's pension liability remained an issue throughout the early 2000s. Mayor John O'Leary, who succeeded Mayor Traficante, borrowed against the pension fund in his final year in office to pay the then-retirees' health care costs and base pensions.[1]

When Mayor Fung took office in 2009, the City was in "dire" fiscal condition. At that time, Cranston faced a severe economic recession that was affecting all parts of the country. As

---

[1] Those amounts were repaid to the pension fund the following year.

such, the City experienced high unemployment rates and over $1 billion in decreased property values. Moreover, state aid decreased substantially between 2007 and 2011, and two devastating floods in the spring of 2010 also inflicted a financial toll on the City. In order to improve its financial situation, the City made cuts to personnel, eliminated city vehicles, and increased health care co-shares for its employees.

In 2011, the General Assembly passed the Rhode Island Retirement Security Act (RIRSA), G.L. 1956 chapter 65 of title 45, legislation focused on promoting the sustainability of municipal pension systems. *See* § 45-65-2. Pursuant to § 45-65-4, a municipality's pension plan would be in "critical status" if "as determined by its actuary, as of the beginning of the plan year, a plan's funded percentage for such plan year is less than sixty percent (60%)." A municipality administering a plan in "critical status" is required, under RIRSA, (1) to give notice of such status to plan participants and other listed individuals and entities and (2) to submit a funding improvement plan detailing the municipality's strategy for emerging from that status. Section 45-65-6. A commission within the Department of Revenue that had been set up under the statute established guidelines for the funding improvement plans, suggesting that, "[g]enerally, the funding improvement period should not exceed 20 years with the plan emerging from critical status within that timeframe." Municipalities not in compliance with the statute faced a reduction in state aid. Section 45-65-7.

Mayor Fung's administration analyzed the health of the City's pension system during his first term. By June 30, 2011, the unfunded accrued liability of the pension plans had risen to $256 million.[2] In 2012, the pension system was funded at only 16.9 percent, meeting the definition for

_____

[2] One of the biggest factors contributing to this unfunded liability of the plan was historic underfunding of the plan due to the City's failure to pay 100 percent of its annual required contribution (ARC). Mayor Fung testified that the ARC is the amount that the City is supposed to

"critical status" pursuant to § 45-65-4. In accordance with § 45-65-6, Mayor Fung sent a letter to all pensioners enrolled in the City's pension system informing them of the "critical status." The City next put together an "alternative funding improvement plan consistent with the [requirements of § 45-65-6]." In doing so, the City considered a number of options, including raising taxes, cutting more personnel, and eliminating city services. Additionally, in September 2012, Mayor Fung met with City pensioners to keep them apprised of the pension situation and also to propose a ten-year COLA suspension as the preferred method of raising the plan from critical status. Thereafter, Mayor Fung presented the COLA suspension plan to the City Council in two proposed ordinances in October 2012.

Shortly after, Mayor Fung withdrew the proposed ordinances in favor of negotiations with the plan participants, and, in the months that followed, he met with the police and firefighter unions and persons who represented the City's police and firefighter retirees. After meeting with the unions and retirees, the City's actuaries ran twenty to thirty additional scenarios for plans to lift the pension system from critical status. Ultimately, however, the City enacted two ordinances on April 23, 2013 (the 2013 ordinances)—No. 2013-5, governing police retirees, and No. 2013-6, governing fire retirees—suspending the minimum 3 percent COLA for ten years, beginning July 1, 2013.

Following the passage of the 2013 ordinances, The Cranston Police Department Retirees Association, Inc., and Local 1363 Retirees Association filed suit against the City on behalf of retirees enrolled in the City's pension plan, alleging that the 2013 ordinances violated the United States and Rhode Island Constitutions. The parties reached a settlement agreement, and a final

---

contribute to the pension plan as determined by City actuaries "after reviewing the plan, all the plan participants, the funding of the plan, [and] the investments[.]"

consent judgment was entered in December 2013. The agreement provided for a COLA suspension in alternating years for ten years, and a 1.5 percent COLA payment in years eleven and twelve. Each retiree was given the opportunity to opt out of the settlement agreement and to retain the right to pursue civil claims against the City. The members of CPRAC are retirees enrolled in the City's pension system who opted out of the settlement agreement.

## II

## Procedural History

## A

## Pretrial Motions

On June 28, 2013, plaintiff filed an eight-count complaint in Superior Court against the City, Mayor Fung, and the members of the Cranston City Council.[3] The complaint included allegations of violations of the United States and Rhode Island Constitutions, a state statute, and breach of contract.[4] The defendants filed a motion to dismiss six of the eight counts, as well as an answer to the complaint. The trial justice granted defendants' motion to dismiss in part, dismissing counts VI and VIII of the complaint. During the course of discovery, defendants filed a motion

---

[3] The complaint named John Lanni, Jr., Donald Botts, Jr., Mario Aceto, Michael J. Farina, Michael W. Favicchio, Paul H. Archetto, Richard D. Santamaria, Jr., Sarah Kales Lee, and Steven A. Stycos, in their capacity as members of the Cranston City Council. The named members of the city council, along with Mayor Fung, will be referred to hereafter as the "Non-City" defendants.

[4] In count I, plaintiff sought a declaration that the 2013 ordinances violated the Contract Clauses of the United States and Rhode Island Constitutions. The plaintiff alleged a breach of contract claim and constitutional violation of the Takings Clauses of the United States and Rhode Island Constitutions in count II. In count III, plaintiff alleged that the enactment of the 2013 ordinances by the mayor and city council members was facially unconstitutional, and sought a declaratory judgment to that effect. Count IV of the complaint alleged that the enactment of the 2013 ordinances was barred by the doctrine of *res judicata* and that the ordinances were thus void *ab initio*. Count V of the complaint asked for equitable or injunctive relief. In counts VI and VII, plaintiff alleged a violation of civil rights pursuant to 42 U.S.C. §§ 1983 and 1988, and the Open Meetings Act, G.L. 1956 chapter 46 of title 42, respectively. Finally, in count VIII, plaintiff alleged that defendants violated the fiduciary duty owed to retirees.

- 5 -

for a protective order to prevent plaintiff from deposing city councilmember John Lanni, Jr. On September 15, 2015, the trial justice granted defendants' motion on the basis that Lanni enjoyed the privilege of legislative immunity, and that the topics about which plaintiff sought to question Lanni were related to his position as a legislator.

In the month prior to trial, the parties filed several motions for summary judgment. On October 9, 2015, the Non-City defendants filed a motion for summary judgment on all remaining counts. One week later, the City filed a motion for summary judgment as to plaintiff's Takings Clause claim. The plaintiff filed its own motion for summary judgment on October 19, 2015, seeking summary judgment on its claims based on *res judicata* and on the violation of the Rhode Island Open Meetings Act, G.L. 1956 chapter 46 of title 42 (the OMA). The City also filed a cross-motion for summary judgment as to the *res judicata* and OMA counts.

The trial justice heard arguments on all four summary judgment motions at a hearing held on November 2, 2015. On that same day, the trial justice issued a decision from the bench, granting summary judgment in favor of the Non-City defendants on all counts, and in favor of the City as to *res judicata* and the Takings Clause claim. The trial justice reserved judgment on the OMA claim until November 6, 2015, when she rendered a bench decision granting summary judgment in favor of the City.

The City had also filed a motion *in limine* to determine the appropriate burden of proof for the Contract Clause claim. The trial justice heard arguments on this motion at the November 2, 2015 hearing, and rendered a bench decision on November 6, 2015. The trial justice relayed that she would employ a burden-shifting analysis on part of the Contract Clause analysis, with specific burdens of production on each party at each stage of the analysis.

- 6 -

Three days before trial, the City sought leave to amend its answer to the complaint to specifically deny some of plaintiff's allegations and to formally add an affirmative defense. The City contended that these amendments would simply ensure that its pleading conformed to the positions that it had taken throughout the litigation and to evidence the City intended to introduce during the upcoming trial. The trial justice granted the City's motion to amend on the morning the trial began, over plaintiff's objection.

**B**

**Trial**

On November 9, 2015, the first day of trial, three counts of plaintiff's complaint remained: violation of the Contract Clause, breach of contract, and injunctive relief. Sixteen witnesses testified over the course of five days. Their testimony is summarized below.

The plaintiff presented testimony from nine members of CPRAC, two former Cranston mayors, and an actuary, who provided expert testimony. The City presented testimony from the current mayor, the City's finance director, an actuary, and a current Cranston firefighter.

Glenn Gilkenson, president of CPRAC, testified first. Gilkenson retired from the Cranston Police Department in 2008 after twenty-five years of service. Gilkenson testified that, according to the collective bargaining agreement under which he retired, he received a pension and COLA adjustments. According to Gilkenson, after the 2013 ordinances passed, he spoke to a few retired police officers and firefighters who were in the same situation, and they decided to form a nonprofit organization, CPRAC, to fight the suspension of their COLA benefits. Gilkenson testified that CPRAC started with seventy-five members, and, at the time of trial, had seventy-one members. Gilkenson testified that it was CPRAC's policy and strategy to not negotiate with the City with

respect to a reduction of the COLA, and he also stated that the COLA freeze had impacted his personal finances.

Following Gilkenson's testimony, plaintiff presented eight other members of CPRAC as witnesses over the course of the first two days of trial: retired firefighter Vincent Matrumalo and retired police officers Edward Walsh, William Lynch, David Greene, Robert Davies, Charles Galligan, Edward Evans, and Vincent Maccarone. Similar to Gilkenson's testimony, these CPRAC members consistently testified that they had believed they would receive COLA benefits for life, and that the suspension of the COLA benefit had a significant financial impact on their lives. Each of the CPRAC members' collective bargaining agreements (CBAs) were admitted as trial exhibits. Each CBA, beginning in 1997, provided for COLAs to the pension benefits at a rate of at least 3 percent, compounded on July 1 of each year.

The plaintiff then called Michael Traficante, mayor of Cranston from 1985-1999, to the stand. Mayor Traficante testified that he became aware of the City's pension crisis as early as 1984, when he served as city council president. He further testified about negotiations with the police and firefighter unions in the mid-1990s to address the pension crisis. According to Mayor Traficante, the City explored many alternatives to address the pension liability aside from moving the pensioners into the state system, including a pension bond or supplemental tax, but ultimately decided that moving the pensioners into the state system was the best course of action. The plaintiff also called Mayor Traficante's successor, John O'Leary, to testify. Mayor O'Leary served as mayor from 1999 until 2003. Mayor O'Leary testified that, in his final year as mayor, he borrowed money from the fire and police pension fund as a one-time allocation to pay for retirees' health care costs, and that the debt was repaid the following year.

- 8 -

The City's current mayor, Allan Fung, took the stand next, having been called by defendants. Mayor Fung testified that, just after he took office in 2009, he examined the City's fiscal condition and discovered that it was "very dire." According to Mayor Fung, the economic recession of the late 2000s had taken a toll on the City, as it had on other cities across the country, and made it difficult for the City to raise revenue. Additionally, Mayor Fung testified, the City experienced two devastating floods in 2010, and state aid decreased dramatically in the first few years of his administration—by $18 million between 2007 and 2011. Mayor Fung testified that he felt that if the City did not address the financial crisis, Chapter 9 bankruptcy "could be a very real possibility[.]"

Mayor Fung further testified about the critical status of the City's pension system as of 2011, stating that, at its lowest point, the system was funded at only 16.9 percent, with $256 million of unfunded accrued liability. He testified that a combination of factors led to this situation, including the compounded COLAs for municipal retirees and historic underfunding of the entire municipal pension system. Mayor Fung testified that his administration considered many alternatives to determine the best solution for emerging from "critical status" within the twenty-year guideline. In addition to a ten-year suspension of the COLA, Mayor Fung testified, the City implemented wage freezes, layoffs of City employees, tax increases, health care co-share increases, and expense reduction, in order to raise revenue during its financial crisis.

Robert Strom, finance director for the City, testified next for defendants. Strom reiterated Mayor Fung's statements that the City had suffered a financial crisis during the first few years of the Fung administration. Strom further testified that he believed that the City would face serious consequences if the twenty-year guideline for emerging from "critical status" was not met, including reduced or eliminated state funds, which were instrumental to the City's budget. Strom

also testified that raising taxes on the City's residents would not resolve the pension system's problems because the City would need to raise taxes so substantially that it would have been unfair and unsustainable, considering the fact that the City already had one of the highest tax rates in the state.

The plaintiffs called their retained expert, William Fornia, to the stand on the penultimate day of trial.[5] Fornia testified that he is an actuary by profession and had been a pension consultant for several large consulting firms for many years prior to starting his own company. Fornia testified that, based on his expert analysis of the actuarial reports commissioned by the City, the COLA suspension caused an average loss of $210,000 per retiree. Fornia further testified that the City's pension problems were foreseeable and predictable, and that the City had not chosen the least drastic remedy available when it chose to suspend the COLAs.

After the plaintiff rested, the City called two more witnesses to conclude the testimony at trial: expert witness Daniel Sherman, an actuary, and Paul Valletta, Jr., a current Cranston firefighter and president of the firefighters' union. Sherman rebutted some of plaintiff's expert's conclusions, particularly with respect to the pension system's shortfall calculation and the COLA change alternatives. Valletta testified about the negotiations between Mayor Fung and the unions and retirees prior to the passage of the ordinances. The trial ended on November 17, 2015.

On July 22, 2016, the trial justice issued a written decision resolving, in favor of the City, the claims for violation of the Contract Clauses of the United States and Rhode Island Constitutions, breach of contract, and injunctive relief. The details of her decision that are salient

---

[5] The day before Fornia testified, the City moved to prevent him from testifying as to certain subjects, a motion that the trial justice denied.

to the issues plaintiff raises on appeal will be discussed *infra*. Final judgment in favor of all defendants was entered on August 4, 2016.

## C

### Posttrial Motions

Following entry of final judgment, the City filed a motion for costs. The plaintiff objected and filed a motion to stay consideration of the bill of costs until plaintiff's appeal was decided by this Court. The trial justice heard argument on the motions on October 13, 2016, when she summarily denied plaintiff's motion to stay and awarded costs to the City in the amount of $9,717.85.

## III

### Issues on Appeal

Before this Court, plaintiff challenges several pretrial decisions, some of the trial justice's findings and conclusions after trial, and the posttrial award of costs in favor of the City.[6] Specifically, plaintiff argues that the trial justice erred by: (1) finding that the 2013 ordinances did not violate the Contract Clauses of the United States and Rhode Island Constitutions; (2) misapplying the burden of proof in the Contract Clause analysis; (3) misconceiving and misapplying expert testimony; (4) granting summary judgment in favor of the City as to the Takings Clause, *res judicata*, and OMA claims; (5) granting defendants' motion for a protective order as to Councilmember Lanni; (6) granting summary judgment in favor of the Non-City defendants on all counts; (7) granting the City's motion to amend its answer shortly before trial;

---

[6] The plaintiff does not challenge the trial justice's decision following trial with respect to the claims for breach of contract or injunctive relief.

- 11 -

and (8) summarily dismissing plaintiff's motion to stay and granting, in part, the City's motion for costs. We will take each issue in turn.

**A**

**Contract Clause**

The trial justice concluded that the 2013 ordinances suspending plaintiff's members' COLAs did not violate the Contract Clauses of the United States or Rhode Island Constitutions. Before this Court, plaintiff claims two errors as to the trial justice's Contract Clause analysis. First, plaintiff argues that the trial justice erred in the determination and application of the burden of proof at trial. Second, plaintiff argues that the trial justice erred in ultimately finding in favor of the City on this issue.

This Court has held that we "will apply a *de novo* standard of review to questions of law that may implicate a constitutional right." *Goetz v. LUVRAJ, LLC*, 986 A.2d 1012, 1016 (R.I. 2010). However, we will not disturb the factual findings made by a trial justice sitting without a jury "unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence." *Gregoire v. Baird Properties, LLC*, 138 A.3d 182, 191 (R.I. 2016) (deletion omitted) (quoting *South County Post & Beam, Inc. v. McMahon*, 116 A.3d 204, 210 (R.I. 2015)). "When the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for his or hers even though a contrary conclusion could have been reached." *Id.* (brackets omitted) (quoting *South County Post & Beam, Inc.*, 116 A.3d at 210).

The Contract Clauses of the United States and the Rhode Island Constitutions prevent the state from enacting laws "impairing the obligation of contracts[.]" U.S. Const. Art. I, § 10, cl. 1; R.I. Const. art. 1, § 12. "Although the Contract Clause appears literally to proscribe 'any'

impairment, * * * 'the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula.'" *United States Trust Company of New York v. New Jersey*, 431 U.S. 1, 21 (1977) (quoting *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428 (1934)). Moreover, "[t]hough the Framers apparently had in mind only purely private contracts (particularly debt obligations) the Clause routinely has been applied to contracts between states and private parties." *Nonnenmacher v. City of Warwick*, 722 A.2d 1199, 1202 (R.I. 1999) (deletion omitted) (quoting *McGrath v. Rhode Island Retirement Board, Etc.*, 88 F.3d 12, 16 (1st Cir. 1996)). The Contract Clause "has been interpreted to apply to municipalities as well." *Id.*

We have previously adopted the United States Supreme Court's three-part analysis for Contract Clause issues. *Nonnenmacher*, 722 A.2d at 1202 (citing *General Motors Corporation v. Romein*, 503 U.S. 181, 186 (1992)). "A court first must determine whether a contract exists." *Id.* (citing *McGrath*, 88 F.3d at 16). Second, "[i]f a contract exists, the court then must determine whether the modification results in an impairment of that contract and, if so, whether this impairment can be characterized as substantial." *Id.* (citing *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-12 (1983)). "Finally, if it is determined that the impairment is substantial, the court then must inquire whether the impairment, nonetheless, is reasonable and necessary to fulfill an important public purpose." *Id.* (citing *Energy Reserves Group, Inc.*, 459 U.S. at 412).

**1**

**Burden of Production**

Before addressing the merits of plaintiff's Contract Clause argument, we turn to whether the trial justice erred in her conclusions about the burden of production at each stage of the analysis. When the trial justice ruled on the City's motion *in limine* regarding the burden of proof for

plaintiff's Contract Clause claim, she set out the following rubric: (1) "[p]laintiff bears the burden of production in establishing [whether the state law has substantially impaired a contract] beyond a reasonable doubt"; (2) if plaintiff meets that burden, "the burden of production shifts to the defendant to prove" that the 2013 ordinances were reasonable and necessary to fulfill a significant and legitimate public purpose; and (3) "[t]hereafter, a plaintiff may, of course, rebut with evidence that the legislation was not reasonable and necessary * * * beyond a reasonable doubt." The trial justice further stated that the City's burden with respect to demonstrating a reasonable and necessary legitimate public purpose would be satisfied by credible evidence. The trial justice also stated that she would use a "less deference" standard in evaluating the City's argument whether the legislation was reasonable or necessary.

On appeal, plaintiff asserts that, despite her articulated rubric, the trial justice gave "nearly complete deference" to the City regarding the degree and necessity of the contractual impairment. The plaintiff argues that the City should have been required to demonstrate, at the very least, a preponderance of the evidence, rather than "credible evidence," regarding its justification for the impairment; and plaintiff contends that the correct standard in this case should actually be clear and convincing evidence. For its part, the City argues that the trial justice should not have shifted the burden of production at all, but that she ultimately reached the correct conclusion. We review the trial justice's determination and application of the burden-shifting analysis *de novo*. *See Panarello v. State Department of Corrections*, 88 A.3d 350, 366 (R.I. 2014). We note that "it would be reversible error for a trial justice to apply the wrong burden of proof." *Id.*

"[T]he term 'burden of proof' embraces two different concepts"—the burden of production and the burden of persuasion. *Murphy v. O'Neill*, 454 A.2d 248, 250 (R.I. 1983). "The 'burden of persuasion' refers to the litigants' burden of establishing the truth of a given proposition in a case

by such quantum of evidence as the law may require[,]" and it "never shifts." *Id.* (punctuation omitted). The burden of production, also referred to as the "burden of going forward with the evidence," *DeBlois v. Clark*, 764 A.2d 727, 732 n.3 (R.I. 2001), "shifts from party to party as the case progresses." *Murphy*, 454 A.2d at 250.

We must first resolve whether the trial justice properly determined that a burden-shifting analysis applies in this case. Courts have not been uniform in shifting the burden of production to the state in the Contract Clause context following a finding of substantial impairment. For example, in *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307 (6th Cir. 1998), the Sixth Circuit required that a "*state* must proffer a 'significant and legitimate' public purpose for the regulation warranting the extent of the impairment caused by the measure." *Pizza*, 154 F.3d at 323 (quoting *Energy Reserves Group Inc.*, 459 U.S. at 411) (emphasis added). However, in *United Automobile, Aerospace, Agricultural Implement Workers of America International Union v. Fortuño*, 633 F.3d 37 (1st Cir. 2011), the First Circuit held that "*the plaintiffs* bear the burden on the reasonable/necessary prong of the Contract Clause analysis[,]" and that "neither [the First Circuit] nor the Supreme Court has ever held" that the state must prove reasonableness and necessity of the regulation. *Fortuño*, 633 F.3d at 42, 44 (emphasis added). The First Circuit has also acknowledged, however, that "many courts have concluded that this burden rests with the state, and others, including this court and the Supreme Court, have used language that arguably supports such a conclusion." *Id.* at 43 (footnotes omitted). Indeed, in *Energy Reserves Group, Inc.*, the United States Supreme Court held that, "[i]f the state regulation constitutes a substantial impairment, *the State, in justification*, must have a significant and legitimate public purpose behind the regulation[.]" *Energy Reserves Group, Inc.*, 459 U.S. at 411 (emphasis added); *see also United*

- 15 -

*States Trust Company of New York*, 431 U.S. at 31 ("In the instant case *the State* has failed to demonstrate that repeal of the 1962 covenant was similarly necessary.") (emphasis added).

This Court has not yet expressly adopted a burden-shifting analysis regarding the Contract Clause, but we have alluded to it: "if the law constitutes a substantial impairment, can *the state* show a legitimate public purpose behind the regulation * * *?" *Rhode Island Depositors Economic Protection Corporation v. Brown*, 659 A.2d 95, 106 (R.I. 1995) (citing *Energy Reserves Group, Inc.*, 459 U.S. at 411-12) (emphasis added). In that case we held, however, that no contractual right was implicated, and therefore we did not reach this factor of the Contract Clause analysis. *Id.* Given the language of the standard set out in the United States Supreme Court cases and the general logic that the City would have access to the information and motivation to demonstrate its justification for the contractual impairment, we find no fault in the trial justice's conclusion that the City bore the burden of production as to the reasonable-and-necessary element of the analysis.

We proceed now to plaintiff's argument that the trial justice erred in requiring the City to proffer only credible evidence of its justifications, and that she erred in her application of the burden of proof because she gave the City "nearly complete deference," which effectively failed to shift the burden of production to the City at all. We have previously held that "a duly enacted ordinance carries with it a presumption of constitutionality which will disappear only on a contrary showing beyond a reasonable doubt." *Town of Glocester v. Olivo's Mobile Home Court, Inc.*, 111 R.I. 120, 124, 300 A.2d 465, 468 (1973). "[H]owever, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *United States Trust Company of New York*, 431 U.S. at 25-26. Thus, as the trial justice in the present case noted, a "less deference" standard was appropriate to analyze the City's proffered evidence for the reasonableness and necessity of the 2013 ordinances. *See Baltimore*

*Teachers Union, American Federation of Teachers Local 340, AFL-CIO v. Mayor and City Council of Baltimore*, 6 F.3d 1012, 1019 (4th Cir. 1993) ("While complete deference is inappropriate, however, at least some deference to legislative policy decisions to modify these contracts in the public interest must be accorded.").

The specific quantum of proof the City must meet has not been clearly set forth either by this Court or the United States Supreme Court. However, the Supreme Court has said that, if substantial impairment is found, "the State, *in justification*, must have a significant and legitimate public purpose behind the regulation," and that the government actor is afforded a limited amount of deference as to that showing. *Energy Reserves Group, Inc.*, 459 U.S. at 412. Thus, we find no error in the trial justice's determination of the burden of proof in this case.

With respect to her application of the burden of proof, a review of the record and the trial justice's decision demonstrates that the trial justice did not fail to shift the burden of production to the City. It is clear that the trial justice required the City to put forth evidence demonstrating a significant and legitimate public purpose for the 2013 ordinances, and that the 2013 ordinances were reasonable and necessary. Moreover, we disagree with plaintiff that the trial justice afforded the City complete deference. In fact, the trial justice set forth a credible evidence standard to be sure that the City was not afforded complete deference as to its justifications.[7] The trial justice, as required of a factfinder at trial, weighed the evidence and made credibility determinations. The fact that she gave "great weight" to testimony at trial by Strom, Sherman, and Mayor Fung does

---

[7] Before trial, the trial justice rejected the City's request for an "any admissible evidence" standard, noting that "[a]n any admissible evidence standard does not allow for any level of judicial scrutiny." The trial justice instead determined that she would employ the higher standard of credible evidence in order to balance the interests between the "constitutional context here and the utilization of less deference scrutiny."

not equate to "complete deference." Thus, we also find no error in the trial justice's application of the burden of proof.

**2**

**Substantive Claim**

We will next examine plaintiff's arguments as to the merits of its Contract Clause claim. In her decision following trial, the trial justice concluded that plaintiff had met its burden of establishing that the 2013 ordinances substantially impaired the contractual rights of plaintiff's members beyond a reasonable doubt. The trial justice specifically found that the 3 percent COLA was a vested right under the contract, and that the "cumulative impact [of the 2013 ordinances] to the individual was substantial." Moreover, the trial justice found that the City had demonstrated a significant legitimate public purpose: "to remedy the fiscal emergency and keep at bay threatened cuts in state aid which would inexorably worsen the fiscal situation." The trial justice also concluded that the 2013 ordinances were reasonable and necessary, finding that the City presented sufficient evidence that it had considered alternatives, a more moderate course was not available, and the 2013 ordinances were reasonable in light of the surrounding circumstances because they were "circumscribed, temporary, precipitated by a fiscal emergency, and prospective."

The City argues that the trial justice erred in concluding that plaintiff proved the existence of a contractual right and that, therefore, the 2013 ordinances could not have substantially impaired a contractual obligation. Although we recognize the significance of this argument, because the City did not file a cross-appeal, this argument is not properly before us. *Miller v. Metropolitan Property and Casualty Insurance Company*, 88 A.3d 1157, 1162 n.8 (R.I. 2014) ("[I]f the prevailing party in the trial court wishes to overturn one of the lower court's rulings below, a cross appeal must be filed.") (quoting David A. Wollin, *Rhode Island Appellate Procedure* § 4:5, 4-11

(West 2004)). Thus, we assume, without deciding, the correctness of the trial justice's conclusion in that regard, and instead move to the third part of the Contract Clause analysis, which requires an inquiry as to "whether the [contractual] impairment [was] reasonable and necessary to fulfill an important public purpose." *Nonnenmacher*, 722 A.2d at 1202. The plaintiff challenges the trial justice's findings as to both whether a legitimate public purpose existed and whether the 2013 ordinances were reasonable and necessary. We will take each argument in turn.

**a**

**Significant and Legitimate Public Purpose**

First, plaintiff contends that the trial justice erred in finding that a significant and legitimate public purpose existed because the factors she relied on to reach this conclusion, according to plaintiff, "neither individually nor combined, constitute[d] a 'fiscal emergency' as a matter of law to trigger forgiveness under the Contracts Clause." Specifically, plaintiff avers that the financial problems faced by the City were common to many other municipalities, no immediate action was necessary to remedy the issues, the crisis was not created by the enactment of the pension statute, and a crisis of the City's own making cannot allow for a finding of a legitimate public purpose.

As we have stated, the United States Supreme Court has held that, "[i]f the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, * * * such as the remedying of a broad and general social or economic problem." *Energy Reserves Group, Inc.*, 459 U.S. at 411-12. The Supreme Court has further instructed that "the public purpose need not be addressed to an emergency or temporary situation." *Id.* at 412. We are mindful, however, that a legitimate public purpose is not to be found in all circumstances, particularly when related to economic issues. "If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an

- 19 -

important public purpose, the Contract Clause would provide no protection at all." *United States Trust Company of New York*, 431 U.S. at 26; *see also Allied Structural Steel Company v. Spannaus*, 438 U.S. 234, 242 (1978) ("If the Contract Clause is to retain any meaning at all, however, it must be understood to impose *some* limits upon the power of a State * * *.") (emphasis in original). Thus, "the purpose may not be simply the financial benefit of the sovereign." *Buffalo Teachers Federation v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006).

This Court has previously discussed public purposes for challenged legislative actions in the context of the Contract Clause. For example, in *Nonnenmacher*, although we found that an ordinance requiring a setoff of disability payments under a city's pension plan did not result in a substantial impairment of a contractual right, we stated that, assuming it did, there would be no violation of the Contract Clause because the ordinances in question "serve[d] to protect the solvency of the pension system and thereby serve[d] an important public purpose." *Nonnenmacher*, 722 A.2d at 1201, 1203, 1204; *see Retired Adjunct Professors of State of Rhode Island v. Almond*, 690 A.2d 1342, 1347 (R.I. 1997) (holding that, assuming a statute limiting the amount of part-time work in which a state employee could engage while receiving state pension benefits substantially impaired the contract, it was "both reasonable and necessary to advance the legitimate public purpose of fostering public confidence in the State's retirement system by restricting the proclivity of some public pensioners to indulge in what is colloquially referred to as 'double dipping'"). Furthermore, in *In re Advisory Opinion to the Governor (DEPCO)*, 593 A.2d 943 (R.I. 1991), this Court stated that "[t]he concept of public purpose * * * is not static but must be sufficiently flexible to meet the ever-changing needs of our complex society[,]" and, further, that "[t]he modern trend of authority is to expand and to construe liberally the meaning of public

- 20 -

purpose, especially in the area of economic welfare." *In re Advisory Opinion to the Governor (DEPCO)*, 593 A.2d at 948.

Here, the trial justice found that "the 2013 [o]rdinances were passed for a significant and legitimate public purpose[,]" reasoning, in part, that "the City has produced sufficient credible evidence through the testimony of Mayor Fung, Mr. Strom, and Mr. Sherman that the Great Recession, the decline in state aid, and RIRSA's requirements created an unprecedented fiscal emergency neither created nor anticipated by the City." The trial justice further concluded that "there is no indication that the 2013 [o]rdinances sought to benefit one particular group or individual over others."

We, too, are of the opinion that the City has demonstrated a significant and legitimate public purpose for the passage of the 2013 ordinances. These ordinances were not intended merely for the "financial benefit of the sovereign[,]" *Buffalo Teachers Federation*, 464 F.3d at 368, but, rather, were designed to address the City's serious fiscal crisis, one that was brought about by several factors, many not within the City's control. One of the most critical factors precipitating the 2013 ordinances was a severe and historic recession in the years just prior to the passage of the ordinances, which the trial justice found "had far reaching and devastating economic and general social consequences" for the City. Moreover, as noted, we have previously opined that "protect[ing] the solvency of [a] pension system" could be a legitimate public purpose—one that, here, is critically important to plaintiff's members, who derive income from the system. *Nonnenmacher*, 722 A.2d at 1204. Thus, we find no error in the trial justice's conclusion that the

2013 ordinances served a "significant and legitimate public purpose[.]" *See Energy Reserves Group, Inc.*, 459 U.S. at 411.

**b**

**Reasonable and Necessary**

The plaintiff also argues that "the City's suspension of the COLA was neither reasonable nor necessary." The plaintiff specifically contends that the trial justice erred as to her determination of reasonableness because: (1) the underfunding of the pension plans existed when the City's contractual obligation to the pensioners began; (2) the trial justice misconstrued the ordinances as "prospective" and "temporary"; and (3) the City did not adequately consider other policy alternatives, but instead chose a drastic impairment which was politically expedient. For its part, the City counters that, as to the "prospective" and "temporary" argument, the proper focus should be on the government action, rather than the effect. The City further asserts that plaintiff's argument regarding the policy alternatives "completely ignores the record testimony."

Although courts typically "defer to legislative judgment as to the necessity and reasonableness of a particular measure[,]" a municipality will be afforded less deference "[w]hen [it] impairs the obligation of its own contract[.]" *United States Trust Company of New York*, 431 U.S. at 23. The Second Circuit Court of Appeals has summarized this principle as follows:

> "Ultimately, for impairment to be reasonable and necessary under *less deference scrutiny*, it must be shown that the state did not (1) 'consider impairing the contracts on par with other policy alternatives' or (2) 'impose a drastic impairment when an evident and more moderate course would serve its purpose equally well,' nor (3) act unreasonably 'in light of the surrounding circumstances[.]'" *Buffalo Teachers Federation*, 464 F.3d at 371

- 22 -

(emphasis in original) (deletion omitted) (quoting *United States Trust Company of New York*, 431 U.S. at 30-31).

Furthermore, "the extent of the impairment is 'a relevant factor in determining its reasonableness.'" *Id.* (quoting *United States Trust Company of New York*, 431 U.S. at 27).

Here, the trial justice found the ordinances to be reasonable and necessary because the City presented credible evidence that "it adequately considered and tried other policy alternatives"; "a more moderate course was not available"; and "the 2013 [o]rdinances were circumscribed, temporary, precipitated by a fiscal emergency, and prospective." The trial justice further held that plaintiff did not rebut the City's evidence beyond a reasonable doubt.

Although the plaintiff correctly points out that the underfunding of the pension system existed well before the passage of the 2013 ordinances, it is significant that, quite apart from the historic underfunding, the financial condition of the City and its pension system was greatly impacted by a number of circumstances in the years leading up to the passage of the 2013 ordinances. We appreciate plaintiff's emphasis on a holding from our neighboring commonwealth that "[i]f the foreseen problem has changed between the time of the contracting and the time of the attempted impairment, but has changed only in degree and not in kind, the impairment is not reasonable." *Massachusetts Community College Council v. Commonwealth*, 649 N.E.2d 708, 713 (Mass. 1995). However, the evidence at trial demonstrates that the City's predicament grew out of more than its continued contractual obligations under CBAs and its failure to adequately fund the pension system. Rather, the difficult economic climate, a ruinous flooding situation, and the reduction in state aid compounded the initial underfunding issue. *See Baltimore Teachers Union*, 6 F.3d at 1021 n.13 ("To the extent the City was aware of its precarious financial condition and of possible reductions in state aid when it enacted its budget, however, we believe that the magnitude of the reductions in state aid rendered the budgetary shortfall that gave rise to the salary reductions

- 23 -

tantamount to a difference in kind from one the City might otherwise have anticipated."). We are of the opinion that the trial justice did not misconceive or misconstrue evidence in this regard, and thus we afford significant deference to her factual determinations regarding the City's financial condition.

Furthermore, after reviewing the evidence, we do not discern error in the trial justice's determination that the City adequately considered other policy alternatives. The trial justice listened to the testimony of several witnesses—whom she deemed credible—who testified to that effect. Indeed, Mayor Fung testified that the City considered raising taxes, making more cuts to city personnel, and drastically reducing city services. Mayor Fung also testified that, in order to meet the City's obligations under the funding improvement plan with these alternative measures, the budget cuts or tax raise would need to be significant. Moreover, we agree with the trial justice's conclusions that the 2013 ordinances were narrowly tailored to the problem and that the impairment was temporary and prospective in nature because the 2013 ordinances suspended a *future* benefit for a finite period of time. The 2013 ordinances did not eliminate the COLA benefit altogether, and only affected COLAs not yet made available to retirees. Thus, granting the trial justice due deference, we find no reversible error in her determination that a more moderate course was not available and that the impairment was reasonable in light of the circumstances.

Accordingly, we agree with the trial justice's conclusion that the 2013 ordinances did not violate the Contract Clauses of the United States or Rhode Island Constitutions.

**B**

**Expert Testimony**

The plaintiff argues that the trial justice misconceived and misapplied the testimony of plaintiff's expert at trial. The plaintiff first avers that, because the trial justice disposed of several

- 24 -

pretrial motions regarding plaintiff's expert, she, "as fact-finder, repeatedly reviewed the matters analyzed by the expert and the facts underpinning [Fornia's] anticipated testimony before he ever had a chance to testify[,]" and thus she "essentially pre-judged CPRAC's expert's opinion before the expert was given a chance to offer it." The plaintiff also argues that the trial justice "effectively disqualified" Fornia's expert opinion because she actively disregarded evidence that was undisputed. The plaintiff further contends that the trial justice promoted form over substance during the trial because "the hoops that [Fornia] was required to jump through to impart his testimony effectively neutered any opinion or guidance he attempted to give the court as fact-finder * * *."[8] Finally, plaintiff argues that the trial justice, in error, effectively shifted the burden of production back to plaintiff to prove, through Fornia's testimony, that the COLA suspension was the least drastic alternative.

Conversely, the City contends that, ultimately, Fornia was not prevented from testifying as to any of his opinions. The City also argues that, because this was a bench trial, plaintiff was not harmed if, in fact, the trial justice elevated form over substance, because she ultimately weighed the testimony. Finally, the City asserts that it proved that the COLA suspension was the least drastic alternative, and that asking Fornia to provide calculations to support his opinion that it was not the least drastic alternative was not impermissible.

"On review, we accord great weight to a trial justice's determinations of credibility, which, inherently, are the functions of the trial court and not the functions of the appellate court." *Gregoire*, 138 A.3d at 191 (brackets omitted) (quoting *South County Post & Beam, Inc.*, 116 A.3d

---

[8] At trial, Fornia's testimony was frequently interrupted by objections as to the form of questions posed to him.

at 210). As we have stated, this Court will not interfere with the trial justice's findings unless the trial justice "misconceived or overlooked material evidence." *Id.* (deletion omitted).

"It is the duty of the triers of fact to examine and consider the testimony of every witness regardless of his qualifications, and to grant to particular testimony only such weight as the evidence considered as a whole and the proper inferences therefrom reasonably warrant." *Kyle v. Pawtucket Redevelopment Agency*, 106 R.I. 670, 673, 262 A.2d 636, 638 (1970). Moreover, "[i]t is the duty of a trial justice who is passing upon an issue of fact to determine such issue according to his own judgment, upon all the evidence, enlightened but not controlled by the opinion of experts." *Ashton v. Tax Assessors of Town of Jamestown*, 60 R.I. 388, 396, 198 A. 786, 790 (1938).

We begin our discussion by noting that, after reviewing the trial justice's commentary as to the motion seeking to exclude Fornia's testimony, as well as Fornia's actual testimony at trial, we are not persuaded by plaintiff's claim that the trial justice was "pre-disposed to constrain" the expert's testimony. The trial justice ultimately denied the City's motion *in limine* to exclude Fornia's testimony and, significantly, at trial, allowed him to testify about his opinions set forth in a disputed expert report, which was admitted as a full exhibit during his testimony.

Furthermore, we perceive no reversible error in the trial justice's handling of the witness and reliance—or lack thereof—on his testimony. In her decision, the trial justice clearly articulated the parts of Fornia's testimony that she considered to be significant. The trial justice first indicated that she gave weight to Fornia's opinion that the loss caused by the ordinance was material.[9] As to his opinion about the significant and legitimate public purpose of the 2013 ordinances, the trial justice gave Fornia's testimony "little weight" and clearly articulated the problems she saw in his

---

[9] While the trial justice gave weight to portions of Fornia's opinion, she did not rely on Fornia's specific calculation regarding the average loss incurred by individual retirees.

calculations relating to his testimony on this issue. Finally, the trial justice gave no weight to Fornia's opinion that the City did not choose the least drastic alternative, stating: "Mr. Fornia's opinion did not consider the feasibility of raising taxes, the decline in state aid, or RIRSA's requirements. * * * As such, this opinion is unsupported." The trial justice, sitting without a jury, was entitled to make credibility determinations and weigh the evidence. *See Gregoire*, 138 A.3d at 191. It is clear that the trial justice carefully considered all of Fornia's testimony.

Moreover, we do not see how plaintiff was prejudiced by the trial justice exalting form over substance during Fornia's testimony. While we note that there were many objections as to the form of questions and as to evidentiary foundation during trial, it did not appear that Fornia's testimony was substantively limited in any significant way. Thus, we find no abuse of discretion in the trial justice's handling of the plaintiff's expert at trial, or in her analysis of his testimony.

## C

### Takings Clause

One month prior to trial, defendants filed a motion for summary judgment on plaintiff's Takings Clause claim. In support of their motion, defendants argued that plaintiff's members did not have a "constitutionally protected property interest in a lifetime, uninterrupted three-percent COLA." The defendants further argued that, even if plaintiff's members had a constitutionally-protected interest, the 2013 ordinances temporarily suspending their annual COLA did not constitute a taking. In its objection to the motion, plaintiff asserted that issues of material fact precluded summary disposition as to this particular claim. The trial justice issued a decision from the bench following a hearing, concluding that "a COLA is a vested benefit" and therefore was a property right for the purpose of the Takings Clause. Ultimately, however, the trial justice found

that "the changes to the plaintiff's COLA benefits do not constitute an illegal taking[,]" and she granted defendants' motion for summary judgment.[10]

On appeal, plaintiff contends that the trial justice erred in ruling that no unconstitutional taking occurred. The plaintiff argues that the trial justice improperly treated the COLA benefits as "unearned future compensation, or some type of state-created entitlement" and further incorrectly analyzed the issue as a regulatory taking as opposed to a physical taking. The plaintiff also argues that genuine issues of material fact as to the City's subjective intent and the ordinances' impact, necessity, and superfluity should have precluded the entry of summary judgment.

The defendants counter that there was no genuine issue of material fact that the 2013 ordinances "were prospective, temporary, impaired only a portion of the benefits provided under the collective bargaining agreements, and were part of a larger public program seeking to stabilize the City's finances," and thus the trial justice did not err in granting summary judgment. Additionally, defendants argue that plaintiff did not demonstrate a disputed material fact with respect to the City's legislative findings supporting the ordinances.

It is well settled that "[t]his Court will review the grant of a motion for summary judgment *de novo*, employing the same standards and rules used by the hearing justice." *Cancel v. City of Providence*, 187 A.3d 347, 349 (R.I. 2018) (quoting *Newstone Development, LLC v. East Pacific, LLC*, 140 A.3d 100, 103 (R.I. 2016)). Furthermore, the trial court's decision will be affirmed "only if, after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and that the moving party is entitled to

---

[10] In its brief to this Court, plaintiff asserts that the trial justice decided defendants' motion for summary judgment without having received plaintiff's objection to the motion. However, we find this contention meritless. Immediately after stating that the court did not have the objection, the trial justice went on to say: "Wait a minute. I do have it. Yes. It was filed on Friday. Yes. We do have that."

judgment as a matter of law." *Id.* at 350 (quoting *Newstone Development, LLC*, 140 A.3d at 103). In a motion for summary judgment, "the nonmoving party bears the burden of proving by competent evidence the existence of a disputed issue of material fact and cannot rest upon mere allegations or denials in the pleadings, mere conclusions or mere legal opinions." *Id.* (quoting *Newstone Development, LLC*, 140 A.3d at 103).

The Takings Clauses of the United States and Rhode Island Constitutions provide that a government may not take private property for public use "without just compensation."[11] U.S. Const. Amend. V; R.I. Const. art. 1, § 16. The first step in the analysis of a takings claim is to determine whether a recognizable property right is at stake. *See Parella v. Retirement Board of Rhode Island Employees' Retirement System*, 173 F.3d 46, 58 (1st Cir. 1999). "Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164 (1998) (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).

To answer this threshold question, the trial justice looked to this Court's decision in *Arena v. City of Providence*, 919 A.2d 379 (R.I. 2007), which analyzed whether a COLA benefit for pensioners in the City of Providence was gratuitous or vested. *Arena*, 919 A.2d at 393. We held that, "in Rhode Island, pension benefits vest once an employee honorably and faithfully meets the applicable pension statute's requirements." *Id.* For this determination, a court "must look to the applicable pension ordinance." *Id.* In the case at bar, the trial justice found that the "pervasive"

---

[11] The Fifth Amendment to the United States Constitution reads, in part: "[N]or shall private property be taken for public use, without just compensation." Similarly, article 1, section 16 of the Rhode Island Constitution states, in part: "Private property shall not be taken for public uses, without just compensation."

and specific "lifetime language" in the 2013 ordinances supported the conclusion that the COLA was a vested benefit for plaintiff's members. Neither party challenges the trial justice's decision in this respect. Thus, for the purposes of our Takings Clause analysis, we assume, without deciding, that plaintiff's members have a protected property interest in future COLA payments.

According to plaintiff, the trial justice erred in analyzing the COLA suspension as a regulatory taking as opposed to a physical taking. Both this Court and the United States Supreme Court have distinguished between physical and regulatory takings. *See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 321 (2002); *Brunelle v. Town of South Kingstown*, 700 A.2d 1075, 1081-82 (R.I. 1997). "Physical takings (or physical invasion or appropriation cases) occur when the government physically takes possession of an interest in property for some public purpose." *Buffalo Teachers Federation*, 464 F.3d at 374. Physical takings "are takings per se and always necessitate compensation." *Brunelle*, 700 A.2d at 1081.

In contrast, "[a] regulatory taking transpires when some significant restriction is placed upon an owner's use of his property for which 'justice and fairness' require that compensation be given."[12] *Philip Morris, Incorporated v. Reilly*, 312 F.3d 24, 33 (1st Cir. 2002). "Regulatory takings are further subdivided into categorical and non-categorical takings." *Sherman v. Town of Chester*, 752 F.3d 554, 564 (2d Cir. 2014) (quoting *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1378 n.2 (Fed. Cir. 2008)). "'Anything less than a complete elimination of value, or a total loss,' is a non-categorical taking, which is analyzed under the framework created in" *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978). *Id.* (quoting *Tahoe-*

---

[12] While we have not addressed a regulatory taking in the context of contract rights, this Court has defined a "regulatory taking" in the context of land use as that which "result[s] from 'a radical curtailment of a landowner's freedom to make use of his or her land; that is, by regulatory action which is neither a physical invasion nor a physical restraint.'" *Alegria v. Keeney*, 687 A.2d 1249, 1252 (R.I. 1997) (quoting 26 Am. Jur. 2d *Eminent Domain* § 10 at 453 (1996)).

*Sierra Preservation Council, Inc.*, 535 U.S. at 330). In *Penn Central*, the United States Supreme Court listed three factors it considered of "particular significance" in the regulatory taking analysis: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Penn Central*, 438 U.S. at 124.

As a threshold matter, we agree with the trial justice that the 2013 ordinances fall under the regulatory takings framework. The trial justice aptly reasoned that "the City's ordinances do not present the classic taking in which a government directly appropriates private property for its own use. * * * Rather, the interference with the plaintiffs' COLA benefits 'arises from a public program adjusting the benefits and burdens of economic life to promote the common good.'" (Quoting *Buffalo Teachers Federation*, 484 F.3d at 374.) *See Connolly v. Pension Benefit Guaranty Corporation*, 475 U.S. 211, 225 (1986) (analyzing a takings claim involving contract rights under the *Penn Central* framework). Because the 2013 ordinances apply only temporarily and prospectively to contract rights, the City did not physically take back a payment already made to retirees to appropriate the money for its own use. Thus, we will proceed to consider this Takings Clause claim under the *Penn Central* regulatory takings framework.

The crux of the regulatory analysis focuses on whether a regulation of a property right "goes too far[.]" *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). The United States Supreme Court cautioned, however, that "we must remain cognizant that 'government regulation—by definition—involves the adjustment of rights for the public good,'" *id.* at 538 (quoting *Andrus v. Allard*, 444 U.S. 51, 65 (1979)), and that: "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law[.]" *Id.* (quoting

- 31 -

*Mahon*, 260 U.S. at 413); *see also Connolly*, 475 U.S. at 223 ("Given the propriety of the governmental power to regulate, it cannot be said that the Takings Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another.").

First, as to the economic impact and interference with investment-backed expectations, we recognize that the 2013 ordinances had a financial impact on plaintiff's members. Indeed, the trial justice found, as part of her Contract Clause analysis, and we agree, that the cumulative impact of the COLA suspension on CPRAC's members was significant. However, critical to this analysis is that the suspension of COLA benefits is "temporary and operates only during a control period." *Buffalo Teachers Federation*, 464 F.3d at 375. Furthermore, the COLA suspension impacts only part of the total pension benefits received; it does not take away the base pension payments or any other retirement benefits. *See id.* ("[T]his is not a case in which a law abrogates an entire contract."). We agree with the trial justice that these facts are not disputed.

Additionally, the government action was focused on future benefits and did not affect any COLA payments made prior to its enactment. The City did not "physically invade or permanently appropriate any of the [retirees'] assets for its own use." *Connolly*, 475 U.S. at 225. Moreover, the government action was motivated by a critical need to improve the health of the City's pension system. Indeed, the legislative findings codified in the 2013 ordinances state that:

> "It is in the best interests of residents, individual employees, retirees and beneficiaries of the City of Cranston to maintain a viable and sustainable local police and fire pension plan and to develop a reasonable alternative funding improvement plan to emerge from 'critical status' as required by Rhode Island General Laws section 45-65-6." Providence Code of Ordinances § 2013-6 (Apr. 23, 2013).

Thus, given that it is undisputed that the 2013 ordinances effectuate only a limited suspension of a small part of the overall pension retirement benefits, and that the 2013 ordinances were

prospective, we agree with the trial justice that defendants were entitled to summary judgment on plaintiff's Takings Clause claim.[13]

**D**

*Res Judicata* **& Estoppel**

Prior to trial, plaintiff moved for summary judgment on the count of its complaint seeking a declaratory judgment that the 2013 ordinances were void *ab initio* because prior litigation challenging changes made to retiree pension benefits through ordinances enacted by the City in 2003 precluded future legislative changes to pensions made outside the collective bargaining process.[14] The plaintiff in the instant case alleged in its complaint—and argued in its summary judgment motion—that the Superior Court's decision in the prior litigation (the 2005 decision) meant that the 2013 ordinances were void from their inception based on the doctrine of *res judicata*. The defendants filed a cross-motion for summary judgment, arguing that the 2005 decision was not binding on the trial justice and that *res judicata* did not apply to the present dispute. After the hearing on these cross-motions, the trial justice concluded that *res judicata* did

---

[13] We further note that we find no fault in the trial justice's use of the legislative findings to support her decision. Legislative findings as to the purpose of legislation are "entitled to great deference by the judiciary." *In re Advisory Opinion to Governor*, 113 R.I. 586, 593, 324 A.2d 641, 646 (1974). Therefore, we are of the opinion that the trial justice did not err by according these findings some deference.

[14] In 2003, the City repealed ordinances that had provided pension benefits for retired police officers and retired fire fighters. *City of Cranston v. International Brotherhood of Police Officers, Local 301*, Nos. P.M. 04-1043, P.M. 04-1646, 2005 WL 375087, at *1 (R.I. Super. Ct. Feb. 11, 2005). The two unions to which the retirees had belonged challenged the repeal of the ordinances as a breach of the respective CBAs. *Id.* Arbitration resulted in decisions favorable to the unions, and the City sought to vacate the arbitration awards on the basis that the arbitrators had strayed from the relevant language in the CBAs and that the unions did not have standing to negotiate on behalf of the retirees after they had retired. *Id.* at *6, *7. The Superior Court upheld the arbitration awards, deciding that "any modification of retirees' benefits must be accomplished through collective bargaining." *Id.* at *10.

not apply to the enactment of the 2013 ordinances, denied plaintiff's motion, and granted defendants' cross-motion for summary judgment.

Before us, plaintiff switches the focus of its preclusion claim, arguing that collateral estoppel bars defendants from defending the 2013 ordinances because the 2005 decision clearly stated that defendants could modify retirees' benefits only through a collective bargaining process. The plaintiff contends that the trial justice erred by allowing defendants to relitigate the issue of whether pension benefits could be changed through ordinances rather than through a collective bargaining process. The plaintiff also asserts that there are no meaningful distinctions between the instant litigation and the prior litigation. The defendants, for their part, argue that the issues are different in the instant litigation as compared to the prior litigation because the two sets of ordinances do not change the pension benefits in the same way and the cases were litigated on different legal principles. The defendants also assert that the 2005 decision cannot be applied to prospectively restrain the City from exercising its police powers.

As we have stated earlier in this opinion, we review an appeal from cross-motions for summary judgment *de novo*. *See Cancel*, 187 A.3d at 349. We begin and end our discussion of this issue by concluding that plaintiff's collateral estoppel argument is not properly before us. The plaintiff's claim in its complaint, as well as its argument in connection with its motion for summary judgment, focused exclusively on *res judicata*, and the trial justice resolved the parties' cross-motions after considering the arguments set forth regarding *res judicata*. There is no indication that the trial justice also considered the doctrine of collateral estoppel. The plaintiff mentions collateral estoppel for the first time before us, on appeal. "[A]n issue that has not been raised and articulated previously at [the] trial [court] is not properly preserved for appellate review[.]" *Pineda*

*v. Chase Bank USA, N.A.*, 186 A.3d 1054, 1060 (R.I. 2018) (quoting *In re Shy C.*, 126 A.3d 433, 435 (R.I. 2015)).

Collateral estoppel, or issue preclusion, is, of course, related to *res judicata*, or claim preclusion, but its focus is different. As we have previously described, "[t]he doctrine of res judicata relates to the effect of a final judgment between the parties to an action and those in privity with those parties." *E.W. Audet & Sons, Inc. v. Fireman's Fund Insurance Company of Newark, New Jersey*, 635 A.2d 1181, 1186 (R.I. 1994). "Usually asserted in a subsequent action based upon the same claim or demand, the doctrine precludes the relitigation of all the issues that were tried or might have been tried in the original suit." *Id.* Related, but distinguishable, "[t]he doctrine of collateral estoppel makes conclusive in a later action on a different claim the determination of issues that were actually litigated in a prior action." *Id.* "[C]ollateral estoppel 'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" *Id.* (quoting *Ashe v. Swenson*, 397 U.S. 436, 443 (1970)).

While the elements of the two doctrines are basically the same, the differing focuses of each means that the consideration of arguments related to one does not mean that both doctrines have been considered. Because plaintiff did not raise the doctrine of collateral estoppel before the trial justice and does not argue the principles of *res judicata* before us on appeal, plaintiff's arguments challenging the trial justice's decision on the parties' cross-motions for summary judgment on this claim are not properly before us. Accordingly, judgment as a matter of law in favor of defendants on plaintiff's *res judicata* claim is affirmed.[15]

---

[15] Even if collateral estoppel had been alleged in plaintiff's complaint and argued in plaintiff's motion for summary judgment, defendants would still be entitled to judgment as a matter of law on this claim because they did not have an opportunity to actually litigate their ability to change

# E

## Open Meetings Act

Prior to trial, plaintiff also sought summary judgment on its claim that the Cranston City Council violated the OMA when it introduced what would become the 2013 ordinances at its March 25, 2013 meeting and referred the proposed legislative changes to the finance committee without first placing the proposed changes to the ordinances on the agenda that had been posted prior to that meeting. The plaintiff alleged—and provided uncontroverted evidence—that the Attorney General's office had concluded that the Cranston City Council had indeed violated the OMA by entertaining new business during the March 25, 2013 meeting, when the agenda had not listed any items under the "new business" heading. The defendants filed a cross-motion for summary judgment, arguing that plaintiff did not have statutory standing to bring the OMA

---

their contractual obligations to police and firefighter retirees through the legislative process. *See Allen v. McCurry*, 449 U.S. 90, 94-95 (1980) (recognizing that "a litigant who was not a party to a * * * case [may] use collateral estoppel 'offensively' in a new * * * suit against the party who lost on the decided issue in the first case" (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)), and stating: "But one general limitation the [United States Supreme] Court has repeatedly recognized is that the concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case" (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979))).

As mentioned *supra*, the procedural posture of the prior litigation and the 2005 decision was a motion to vacate an arbitrator's awards. *International Brotherhood of Police Officers, Local 301*, 2005 WL 375087, at *1. The Superior Court's standard of review on a motion to vacate an arbitration award is extremely deferential; indeed, the 2005 decision is clear that the court was "*constrained* to find that the arbitrators' decisions * * * [we]re rational and dr[e]w their essence from the agreements between the parties." *Id.* at *10 (emphasis added). Moreover, the earlier litigation focused on the union-plaintiffs' standing to negotiate on behalf of the retirees as well as the defendants' obligation to honor their contractual obligations to the retirees and the union members under the CBAs. *Id.* at *8-10. While the City and its officials were defendants in both causes of action, they did not have an opportunity to defend their legislative actions through the litigation process and most certainly did not have an opportunity to defend against constitutional claims such as those asserted by plaintiff in the instant litigation. The 2005 decision indicates that the grievances at issue in that prior litigation concerned claims for breach of contract only. *Id.* at *3, *5.

- 36 -

violation claim in Superior Court. The defendants also argued that the proposed changes to the ordinances were not discussed or enacted at the March 25 meeting, and therefore there was no harm from failing to include this item on the printed agenda.

The trial justice heard oral argument on this issue at the summary judgment hearing on November 2, 2015, and rendered a decision from the bench on November 6, 2015. The trial justice found that plaintiff lacked statutory standing to file a complaint in Superior Court alleging a violation of OMA because the statute explicitly limits the right to file a complaint in Superior Court to "individuals," and plaintiff is a group. Accordingly, the trial justice denied plaintiff's motion for summary judgment and granted defendants' cross-motion for summary judgment.

Before us, plaintiff argues that the trial justice erred because the language of § 42-46-8 and this Court's previous interpretation of the statute provides plaintiff, as an organization, with the requisite statutory standing to file a complaint in Superior Court alleging an OMA violation.[16] The defendants argue that § 42-46-8 unambiguously provides exclusive statutory standing to file an OMA violation claim in Superior Court to individuals.

"This Court reviews questions of statutory construction and interpretation *de novo*." *South County Post & Beam, Inc.*, 116 A.3d at 214-15. "When construing a statute, our ultimate goal is to give effect to the purpose of the act as intended by the Legislature." *Id.* at 215 (quoting *Mendes*

---

[16] The plaintiff also argues that defendants waived the standing argument because they failed to timely raise the issue of standing before the trial justice in that they did not include lack of standing to claim an OMA violation in their initial motion to dismiss. A review of the cross-motions for summary judgment, the memoranda submitted in support thereof, the transcript of the hearing on the cross-motions, and the trial justice's bench decision reveals that it is, in fact, plaintiff that has waived its argument: plaintiff did not raise this particular waiver argument before the trial justice, and therefore we will not consider it in the first instance. *See Pineda v. Chase Bank USA, N.A.*, 186 A.3d 1054, 1060 (R.I. 2018) ("[A]n issue that has not been raised and articulated previously at [the] trial [court] is not properly preserved for appellate review.") (quoting *In re Shy C.*, 126 A.3d 433, 435 (R.I. 2015)).

*v. Factor*, 41 A.3d 994, 1002 (R.I. 2012)). "When the statutory language is clear and unambiguous, we give the words their plain and ordinary meaning." *Id.* (quoting *National Refrigeration, Inc. v. Capital Properties, Inc.*, 88 A.3d 1150, 1156 (R.I. 2014)).

We have previously noted that "[a] party acquires standing either by suffering an injury in fact or as the beneficiary of express statutory authority granting standing." *Tanner v. Town Council of Town of East Greenwich*, 880 A.2d 784, 792 (R.I. 2005). "In statutory standing cases, such as this, the analysis consists of a straight statutory construction of the relevant statute to determine upon whom the Legislature conferred standing and whether the claimant in question falls in that category." *Id.* at 792 n.6 (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973)). "In conducting this analysis, we do not look at the eventuality of success on the merits but, rather, at whether a party is arguably within the zone of interests to be protected or regulated by the statute in question." *Id.* (citing *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153-54 (1970)).

We have noted on more than one occasion that the OMA bestows broad statutory standing. *See Tanner*, 880 A.2d at 792; *Solas v. Emergency Hiring Council of State*, 774 A.2d 820, 823 (R.I. 2001). The OMA is in place because "[i]t is essential to the maintenance of a democratic society that public business be performed in an open and public manner and that the citizens be advised of and aware of the performance of public officials and the deliberations and decisions that go into the making of public policy." Section 42-46-1. Indeed, we have stated:

> "[T]he purpose of the OMA is to protect the public's right to participate in the political process, and not an individual's property or contract rights. Thus, the statutory requirement that an individual be 'aggrieved' by a violation of the OMA does not require that a plaintiff allege some harm to his or her economic or property interests, but rather that his or her right to be 'advised of and aware of' the performance, deliberations, and decisions of government

entities was, or may be, violated." *Tanner*, 880 A.2d at 793 (quoting §§ 42-46-1 and 42-46-8).

The OMA provides in § 42-46-8 for the "[r]emedies available to aggrieved persons or entities." To determine who has standing to pursue these remedies, we need to consider two paragraphs within § 42-46-8. Paragraph (a) provides that:

> "Any citizen or entity of the state who is aggrieved as a result of violations of the provisions of this chapter may file a complaint with the attorney general. The attorney general shall investigate the complaint and if the attorney general determines that the allegations of the complaint are meritorious he or she may file a complaint on behalf of the complainant in the superior court against the public body." Section 42-46-8(a).

Paragraph (c) provides that:

> "Nothing within this section shall prohibit any individual from retaining private counsel for the purpose of filing a complaint in the superior court within the time specified by this section against the public body which has allegedly violated the provisions of this chapter; provided, however, that if the individual has first filed a complaint with the attorney general pursuant to this section, and the attorney general declines to take legal action, the individual may file suit in superior court within ninety (90) days of the attorney general's closing of the complaint or within one hundred eighty (180) days of the alleged violation, whichever occurs later." Section 42-46-8(c).

In our view, § 42-46-8 is clear and unambiguous. Individuals and entities have standing to file a complaint with the Attorney General, and the Attorney General has the discretion to file a complaint on behalf of the complainant (individual or entity) in the Superior Court. Section 42-46-8(a). Individuals have the additional option to skip the Attorney General's office and file a complaint directly in Superior Court. Section 42-46-8(c). The trial justice read paragraph (c) as limiting the grant of statutory standing to individuals; according to the trial justice, entities such as plaintiff, a nonprofit corporation, do not have standing to file a claim in Superior Court. We agree. The plain language of § 42-46-8(c) includes "the individual" only and is silent as to entities

of the state. We therefore conclude that plaintiff, as a nonprofit corporation, does not have standing to pursue a claim in Superior Court for violation of the OMA. Accordingly, judgment as a matter of law in favor of defendants on plaintiff's OMA violation claim is affirmed.

**F**

**Legislative Immunity**

The plaintiff also challenges both of the trial justice's pretrial rulings that were based on the doctrine of legislative immunity: (1) the grant of defendants' motion for a protective order concerning the deposition of defendant Lanni, a member of the Cranston City Council; and (2) the grant of defendants' motion for summary judgment as to the Non-City defendants.

The doctrine of legislative immunity extends from the Speech or Debate Clause of the United States Constitution and the similar "speech in debate" clause of the Rhode Island Constitution. *See* U.S. Const., art. I, § 6, cl. 1; R.I. Const., art. 6, § 5; *see also United States v. Brewster*, 408 U.S. 501, 507 (1972); *Holmes v. Farmer*, 475 A.2d 976, 983 (R.I. 1984). We have previously held that "[t]he speech in debate clause contained in Rhode Island's Constitution confers a privilege on legislators from inquiry into their legislative acts or into the motivation for actual performance of legislative acts that are clearly part of the legislative process." *Holmes*, 475 A.2d at 983. Further, "[i]n order fully to effectuate the purpose and design of the speech in debate clause, it must be construed as an immunity from suit as well as a testimonial privilege." *Id.* at 984. This Court has made clear that the privilege extends to municipal officials. *Maynard v. Beck*, 741 A.2d 866, 872 (R.I. 1999). However, while the privilege protects legislators from being "questioned by any other branch of government for their acts in carrying out their legislative duties relating to the legislative process[,]" its scope "does not extend to actions by legislators outside the legislative process." *Holmes*, 475 A.2d at 983.

- 40 -

**1**

**Lanni Protective Order**

In the course of discovery, defendants filed a motion for a protective order to prevent plaintiff from deposing defendant Lanni. The defendants argued that Lanni was protected from deposition by the privilege of legislative immunity, and that his testimony would not be relevant to the central issue of the case. The plaintiff objected to defendants' motion, arguing that the topics plaintiff sought to cover in Lanni's deposition were outside the scope of legislative immunity, including "information concerning the various police and firefighter Collective Bargaining Agreements, the general financial condition of the City, the actions of actuarial consultants, City spending, and budget * * *." The plaintiff also argued that it was entitled to ask Lanni about subjects listed as accomplishments and future goals on his campaign website.[17]

The trial justice granted defendants' motion on the basis that Lanni enjoyed the privilege of legislative immunity, and that the topics plaintiff sought to question Lanni about were related to his position as a legislator. Specifically, the trial justice held that: "Much of what [CPRAC] requests—information relating to police and firefighter Collective Bargaining Agreements, financial conditions and spending of the City, and actuarial reports—can be easily obtained." The trial justice also found that the subjects related to statements on Lanni's campaign website were "less clearly within legislative immunity[,]" but that the privilege applied because "the information from that website is, in substance, material relating to Mr. Lanni's legislative duties."

---

[17] The subjects found on Lanni's website, as outlined in plaintiff's objection to defendants' motion, were: "Tax Freeze 2005-2006"; "Tax Decrease 2006-2007"; "Tax Freeze 2008-2009"; "Reduce the City's $300,000,000 unfunded pension liability"; "Improve the City's Bond Rating"; "Protect the 'Rainy Day Fund'"; "Achieve Tax Stability"; and "Control 'Runaway' city spending." Lanni's website, formerly located at http://www.johnlanniforcranston.com, is no longer active. Accordingly, we rely on plaintiff's filings and the Superior Court's September 15, 2015 decision for this information.

On appeal, plaintiff argues that the trial justice erred in granting defendants' motion because the protective order was excessive in scope and prevented plaintiff from deposing Lanni on subjects that should be considered outside the protection of legislative immunity. The defendants counter that plaintiff has failed to identify a subject of inquiry that would not implicate legislative immunity, and therefore the trial justice did not err.

It is well settled that, "'in granting or denying discovery motions, a Superior Court justice has broad discretion,' which 'this Court will not disturb save for an abuse of that discretion.'" *State v. Lead Industries Association, Inc.*, 64 A.3d 1183, 1191 (R.I. 2013) (brackets and deletion omitted) (quoting *Colvin v. Lekas*, 731 A.2d 718, 720 (R.I. 1999)).

We see no abuse of discretion in the trial justice's analysis. We recognize that legislative immunity "does not protect the political activities of the legislators"; however, "[i]nquiry by the court into the actions or motivations of the legislators in proposing, passing, or voting upon a particular piece of legislation * * * falls clearly within the most basic elements of legislative privilege." *Holmes*, 475 A.2d at 983, 984. The information which plaintiff sought to obtain would have been disclosed to Lanni by virtue of his position as city council member and president; and, more importantly, it formed part of the consideration and approval of the 2013 ordinances. Thus, we are of the opinion that the trial justice did not abuse her discretion in granting defendants' motion for protective order on the basis of legislative immunity.

## 2

### Non-City Defendants

One month before trial, the Non-City defendants filed a motion for summary judgment, arguing that the allegations in the complaint against them were "premised on their legislative acts," and thus they enjoyed the privilege of legislative immunity related to those acts. The plaintiff

objected to the motion, arguing that the Non-City defendants' acts were administrative in nature, and not legislative. The trial justice rejected plaintiff's argument that the acts were administrative in nature; instead, she found that "[i]t is hard for this [c]ourt to imagine something more clearly legislative in nature than the passage of an ordinance." Moreover, the trial justice ultimately found that there was "no genuine issue of material fact that the very core of the plaintiff's claims against the [N]on-City defendants is premised on their performance of legislative acts[,]" and thus, based on the doctrine of legislative immunity, the trial justice held that the Non-City defendants were entitled to summary judgment in their favor.

Before us, plaintiff reiterates the argument that the Non-City defendants' roles in the enactment of the 2013 ordinances were "administrative rather than legislative" in nature, and, thus, they did not enjoy the privilege of legislative immunity.[18] As we have stated, we review the grant of a motion for summary judgment *de novo. Cancel*, 187 A.3d at 349.

"To determine whether challenged conduct is legislative * * * a court must consider the nature of the acts in question, rather than the motive or intent of the official performing them." *Maynard*, 741 A.2d at 870. According to the United States Supreme Court, some "quintessentially legislative" actions include the "introduction of a budget and signing into law an ordinance[,]" as well as other "integral steps in the legislative process." *Bogan v. Scott-Harris*, 523 U.S. 44, 55

---

[18] The plaintiff also argues that the motion for summary judgment "should have been captioned as a Rule 12 motion [because] no matters were in consideration other than those that were in the pleadings[,]" and, if considered under that rule, defendants' assertion of legislative immunity for the Non-City defendants should have been deemed to have been waived because it was raised "on the eve of trial[.]" As defendants contend, plaintiff's argument as to Rule 12 is waived because it was not raised below. "[I]n accordance with this Court's longstanding 'raise-or-waive' rule, if an issue was not properly asserted, and thereby preserved, in the lower tribunals, this Court will not consider the issue on appeal." *Adams v. Santander Bank, N.A.*, 183 A.3d 544, 548 (R.I. 2018) (quoting *Miller v. Wells Fargo Bank, N.A.*, 160 A.3d 975, 980 (R.I. 2017)). The plaintiff failed to assert this contention in its papers or at the hearing below. Thus, we decline to address this argument.

(1998).  While not all actions entitle a government official to the protection of legislative immunity, it is our opinion that the actions by the Non-City defendants here were certainly "legislative in character[.]" *See Maynard*, 741 A.2d at 870.  It is clear that plaintiff's claims stem from the Non-City defendants' participation in the legislative process, as plaintiff does not allege wrongful actions of the Non-City defendants beyond the enactment of the 2013 ordinances.  Thus, the Non-City defendants were entitled to summary judgment.

**G**

**Amendment to Answer**

In November 2015, three days before the trial started, the City filed a motion to amend its answer to clarify its denial of certain allegations in the complaint and to conform the pleading to the evidence.  The proposed amended answer included an additional affirmative defense: that the City exercised its police power when it enacted the 2013 ordinances.  The plaintiff objected to the amendment on the basis that it was untimely and prejudicial because plaintiff would not have time to conduct additional discovery about the new affirmative defense prior to trial.  The trial justice held a brief hearing on the City's motion on the morning of the first day of trial.  At the hearing, the City argued that the exercise of its police power had been a dominant theme throughout the pretrial proceedings and that formally adding this affirmative defense to its answer merely ensured that the pleading conformed to the evidence.  The trial justice granted the motion to amend, concluding that plaintiff had not demonstrated any prejudice that would be caused by the proposed amendments to the answer because the issue of the City's police power had been at the forefront since the beginning of the case.

Before us, plaintiff argues that the trial justice abused her discretion when she allowed the City to amend its answer on the first day of trial because plaintiff was "extreme[ly] prejudice[d]"

by the surprise of the additional affirmative defense and had no time to conduct discovery on this new defense. The plaintiff also faults the trial justice for not asking the City why the amendment was requested so close to the beginning of the trial. The City responds that plaintiff has not adequately explained how it was prejudiced, and therefore, if there was any error in granting the motion to amend, the error was harmless. The City also reasserts that the exercise of police power is inextricably linked to plaintiff's Contract Clause claim, and therefore there was no surprise that the City added this to its answer.

Rule 15 of the Superior Court Rules of Civil Procedure allows litigants to request permission from the trial court to file an amended pleading and provides that such permission "shall be freely given when justice so requires." This Court "accord[s] great deference to the decision by a hearing justice to grant or deny a motion to amend and will not disturb his [or her] decision unless he [or she] abused his [or her] discretion." *CACH, LLC v. Potter*, 154 A.3d 939, 942 (R.I. 2017). We have previously held that amendments to pleadings should be allowed unless the nonmoving party can show the amendment will result in "extreme prejudice" to them, and that "mere delay is not enough to deny the amendment[,]" *id.* (internal citations omitted), unless the trial justice "find[s] that such delay creates substantial prejudice to the opposing party." *Lomastro v. Iacovelli*, 56 A.3d 92, 96 (R.I. 2012) (quoting *Wachsberger v. Pepper*, 583 A.2d 77, 79 (R.I. 1990)).

The plaintiff was given an opportunity to explain to the trial justice how it would be prejudiced by the addition of the affirmative defense. Other than stating that it had no time to conduct additional discovery, plaintiff did not explain how it was prejudiced or what additional discovery it would have conducted had the amended answer been filed sooner. In our opinion, plaintiff did not demonstrate either substantial prejudice by the City's delay in requesting

permission to amend the answer or extreme prejudice by allowing the amendment. We conclude, therefore, that the trial justice did not abuse her discretion when she granted the City's motion to amend its answer, and we affirm this order.

## H

### Bill of Costs/Motion to Stay Consideration of Bill of Costs

On August 5, 2016, one day after the final judgment entered, the City filed a bill of costs, requesting $14,708.01. These costs included fees for acquiring deposition and trial transcripts, printing exhibits, and scanning and making copies of documents. The plaintiff objected to the bill of costs, arguing that the request was excessive because some of the transcripts were generated from witness depositions that were not used during the trial. The plaintiff also filed a motion to stay consideration of the bill of costs until after the appeal was decided by this Court, arguing that the City would not be entitled to these costs if plaintiff prevailed on any of the issues raised in its appeal. The City objected to the motion to stay, arguing that plaintiff had not established that it was entitled to the stay pending appeal. The City also argued that, because an award of costs generates an appealable order, principles of judicial economy dictated that the bill of costs should be decided immediately.

The trial justice held a hearing on October 13, 2016. She summarily denied plaintiff's motion to stay and granted the City's bill of costs, in part, awarding $9,717.85. The award excluded the trial transcript costs and half of the printing fees requested by the City.

On appeal, plaintiff argues that the trial justice erred by not considering its motion to stay prior to considering the bill of costs and denying the motion to stay without providing any reasoning to support her decision. The plaintiff asserts, without any legal support or discussion, that the trial justice "should have heard CPRAC's [m]otion to [s]tay and decided on the merits of

that motion before passing on a bill of costs." The plaintiff also contends that the trial justice's ruling deprived plaintiff of its ability to seek a stay from this Court because the trial justice proceeded to immediately consider and rule on the City's request for costs after she denied the motion to stay. With respect to plaintiff's motion to stay consideration of the City's request for costs, we hold that plaintiff has waived its argument for failure to adequately develop it for our review.[19] *See State v. Florez*, 138 A.3d 789, 798 n.10 (R.I. 2016) ("[T]his Court 'considers an issue to be waived when a party simply states an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues.'") (brackets and deletion omitted) (quoting *Bucci v. Hurd Buick Pontiac GMC Truck, LLC*, 85 A.3d 1160, 1170 (R.I. 2014)).

With respect to the order granting in part the City's request for costs, plaintiff argues that the trial justice abused her discretion by effectively penalizing plaintiff for bringing this litigation and by awarding costs for printing exhibits and deposition transcripts that the City did not prove were necessary to the litigation. The prevailing party in a civil action is entitled to recover costs, "except where otherwise specially provided, or as justice may require, in the discretion of the court." General Laws 1956 § 9-22-5; *see also* Super. R. Civ. P. 54(d) ("Costs (including costs on depositions as provided for in Rule 54(e)) shall be allowed as of course to the prevailing party as provided by statute and by these rules unless the court otherwise specifically directs."). Both the statute and the court rule "endow the trial justice with discretion in conducting a cost-distribution analysis. 'Discretion is not exercised by merely granting or denying a party's request.'" *State v. Lead Industries Association, Inc.*, 69 A.3d 1304, 1309 (R.I. 2013) (brackets omitted) (quoting *DiRaimo v. City of Providence*, 714 A.2d 554, 557 (R.I. 1998)). "The term 'discretion,' rather,

---

[19] We do, however, take the opportunity to remind plaintiff that it could have sought a stay of the enforcement of the order granting the costs, pursuant to Article I, Rule 8 of the Supreme Court Rules of Appellate Procedure.

denotes action taken 'in the light of reason as applied to all the facts and with a view to the rights of all the parties to the action while having regard for what is right and equitable under the circumstances and the law.'" *Id.* (quoting *DiRaimo*, 714 A.2d at 557).

The transcript of the hearing on the plaintiff's motion to stay and the City's bill of costs shows that the plaintiff had a full and fair opportunity to argue its objection to the City's request for costs. Moreover, the trial justice asked the City several questions about the items on the bill of costs and ultimately awarded some of the costs requested. In our opinion, the trial justice did not abuse her discretion in awarding the portion of the costs requested. The order granting in part the bill of costs and denying the plaintiff's motion to stay is, therefore, affirmed.

## IV

### Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court in favor of the defendants as to all counts. We also affirm the order granting the motion for a protective order, the order granting the City's motion to amend the answer to the complaint, and the order granting the City's motion for costs and denying the plaintiff's motion to stay. The record shall be remanded to the Superior Court.


**Justice Robinson, concurring.** It is with a decided lack of enthusiasm and only after prolonged research and reflection and hesitation that I concur in the result reached in the opinion of the Court in this case; and I do so in a decidedly *dubitante* frame of mind. While my principal hesitation about concurring in the result in this case stems from my grave concern with the Contracts Clause aspect of the case, I am also deeply troubled by the Open Meetings Act issue in this case. With respect to the Open Meetings Act, I am particularly troubled about the result which

- 48 -

controlling principles of statutory interpretation require us to reach with respect to the reach of that statutory scheme. For the sake of clarity, I shall address those two areas of concern separately, and I shall do so with relative brevity.[20]

## A

### Impairing the Obligation of Contracts under the Contracts Clause [21]

I readily acknowledge the scholarly nature of the Court's opinion; it represents an impressively Herculean effort to summarize the complex factual background that the case involves.[22] It also represents an impressive effort to apply to those facts the subtle and very

---

[20]    It was only after reading over and over again the trial justice's meticulous fact-finding and credibility assessments and after poring over the often opaque and difficult-to-reconcile principles set forth in the controlling precedents that I concluded that I would be able in good conscience (albeit with much hesitation and many reservations) to concur with the result reached by the majority with respect to both the Contracts Clause and Open Meetings Act issues.

As for the other issues addressed by the majority (expert testimony; the Takings Clause; *res judicata* and collateral estoppel; legislative immunity; the amendment to the answer; and the bill of costs), I join in the opinion of the Court—although I view the bill of costs issue to be exceedingly close.

[21]    The relevant constitutional language should be borne in mind. The stark and straightforward Contracts Clause in the United States Constitution provides that "[n]o state shall * * * pass any * * * Law impairing the Obligation of Contracts." U.S. Const. Art. I, § 10, cl. 1. The parallel Rhode Island constitutional provision is similarly stark and straightforward: "No * * * law impairing the obligation of contracts shall be passed." R.I. Const. art. 1, § 12 (punctuation omitted).

[22]    I also acknowledge the scholarly and detail-oriented nature of the trial justice's rescript decision. Her careful fact-finding and credibility assessments have made the task of this Court less onerous—especially in view of the deferential standard of review that is applicable with respect to same. *See Lamarque v. Centreville Savings Bank*, 22 A.3d 1136, 1140 (R.I. 2011) ("When we review the factual findings of a trial justice sitting without a jury, we accord those findings great deference."); *see also JPL Livery Services, Inc. v. Rhode Island Department of Administration*, 88 A.3d 1134, 1142 (R.I. 2014) ("[W]e accord great weight to a trial justice's determinations of credibility, which, inherently, are the functions of the trial court and not the functions of the appellate court.") (internal quotation marks omitted).

nuanced principles of law that presently prevail and by which one is required to abide in analyzing a claim that a particular enactment is violative of the Contracts Clause.

I have concluded that the relevant precedent compels me to concur when due weight is accorded to the collection of unanticipated occurrences (*e.g.*, events such as what the trial justice refers to as "the Great Recession" and as "two natural disasters in March of 2010") as well as the very crucial fact that the contractual impairment at issue is *temporally limited*.  But for me this case is extremely close.  To my mind, the Court's ruling in this case is the equivalent of standing on the banks of the Rubicon.  In my heart of hearts, I think that we, as a nation and as a state, have strayed far from what the Contracts Clauses were clearly meant to prohibit:  *i.e.*, *any law impairing the obligation of contracts*.

My own thinking in this regard is in accord with the historically-based approach to constitutional issues that Justice Neil Gorsuch of the United States Supreme Court has demonstrated in his perceptive and eloquent dissent in the quite recent case of *Sveen v. Melin*, 138 S.Ct. 1815 (2018).  *Sveen*, 138 S.Ct. at 1826 (Gorsuch, J., dissenting); *see generally* Douglas W. Kmiec & John O. McGinnis, *The Contract Clause: A Return to the Original Understanding*, 14 Hastings Const. L.Q. 525 (1987).  In the portion of his dissent in *Sveen* where he reminds the reader of the unequivocal wording of the Contracts Clause in the United States Constitution, Justice Gorsuch writes as follows in language that I find to be particularly powerful and thought-provoking:

> "The Contracts Clause categorically prohibits states from passing '*any* * * * Law impairing the Obligation of Contracts.' Art. I, § 10, cl. 1 (emphasis added). Of course, the framers knew how to impose more nuanced limits on state power. The very section of the Constitution where the Contracts Clause is found permits states to take otherwise unconstitutional action when 'absolutely necessary,' if 'actually invaded,' or 'wit[h] the Consent of Congress.' Cls. 2 and 3. But in the Contracts Clause the framers were absolute. They took

the view that treating existing contracts as 'inviolable' would benefit society by ensuring that all persons could count on the ability to enforce promises lawfully made to them * * *." *Sveen*, 138 S.Ct. at 1826-27 (Gorsuch, J., dissenting) (emphasis in original).

I for one yearn for the day when the courts will revert to something substantially closer to an "absolutist" understanding of the Contracts Clause. In the meantime, however, I bow obediently, but discontentedly, to the result that prevailing precedent dictates.


**B**

**The Open Meetings Act**

I also very reluctantly concur in that portion of the Court's opinion that deals with the Open Meetings Act issue. *See* G.L. 1956 chapter 46 of title 42. After correctly noting that § 42-46-8(a) authorizes "[a]ny citizen *or entity* of the state" to file an Open Meetings Act complaint with the Attorney General, the Court goes on to point out that § 42-46-8(c) speaks exclusively of the right of an individual (without any mention of entities) to retain private counsel for the purpose of filing a complaint in the Superior Court under the Open Meetings Act. (Emphasis added.) Pursuant to our statutory interpretation jurisprudence, the statute at issue, which is undeniably clear and unambiguous, must be applied as written—*i.e.*, as not authorizing entities to file suit under the Act. *State v. Diamante*, 83 A.3d 546, 548 (R.I. 2014); *In re Harrison*, 992 A.2d 990, 994 (R.I. 2010) ("[W]hen we examine an unambiguous statute, there is no room for statutory construction and we must apply the statute as written.") (internal quotation marks omitted); *see Zambarano v. Retirement Board of the Employees' Retirement System of State*, 61 A.3d 432, 436 (R.I. 2013) ("It is well settled that 'the plain statutory language' is 'the best indicator' of the General Assembly's intent.") (quoting *McCain v. Town of North Providence*, 41 A.3d 239, 243 (R.I. 2012)); *see also Little v. Conflict of Interest Commission*, 121 R.I. 232, 237, 397 A.2d 884, 887 (1979) ("It is a

primary canon of statutory construction that statutory intent is to be found in the words of a statute, if they are free from ambiguity and express a reasonable meaning.").

In the end, I have reluctantly concluded that the statutory language as it presently exists represents a deliberate legislative choice. *See Powers v. Warwick Public Schools*, 204 A.3d 1078, 1088 (R.I. 2019) ("[I]t is not the function of this Court to act as a super legislative body and rewrite or amend statutes already enacted by the General Assembly.") (internal quotation marks omitted); *Olamuyiwa v. Zebra Atlantek, Inc.*, 45 A.3d 527, 536 (R.I. 2012) ("It is not our role to contort the language of an unambiguous statute in order to include within its reach a situation which it plainly does not encompass."); *Little*, 121 R.I. at 237, 397 A.2d at 887 ("[W]e may not alter the meaning to make [a statute] applicable and promote what we think a more desirable result."). I must respectfully state, however, that I have great difficulty in conceiving of a sound public policy reason to allow individuals to bring suit while not giving entities[23] the same right—especially when one keeps in mind the crucially important concept that is the basis for the Open Meetings Act: the need for intense scrutiny of and critical comment about the doings of government. *See, e.g.*, Louis D. Brandeis, *Other People's Money and How the Bankers Use It* 92 (Frederick A. Stokes Company 1914) ("Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants * * *."); *see also Rosanova v. Playboy Enterprises, Inc.*, 580 F.2d 859, 861 (5th Cir. 1978) ("Comment upon people and activities of legitimate public concern often illuminates that which yearns for shadow."). And it should go without saying that the General Assembly remains free to amend the Open Meetings Act so as to give entities of this state

---

[23] It is worth bearing in mind the self-evident point that, after all, entities are made up of individuals.

the same statutory right to sue under the Act as individuals already possess.  *See Pizza Hut of America, Inc. v. Pastore*, 519 A.2d 592, 594 (R.I. 1987).

## C

## Conclusion

For the above-discussed reasons, I reluctantly, and only in view of the relevant judicial precedent and statutory provisions, concur in the result reached by the majority.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Cranston Police Retirees Action Committee v. The City of Cranston, by and through its Finance Director Robert Strom and its City Treasurer David Capuano, et al. |
| **Case Number** | No. 2017-36-C.A. (KC 13-1059) (formerly PC 13-3212) |
| **Date Opinion Filed** | June 3, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Kent County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Sarah Taft-Carter |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Patrick J. Sullivan, Esq.<br>Marisa A. Desautel, Esq. |
| | For Defendants:<br><br>William M. Dolan, III, Esq.<br>William K. Wray, Jr., Esq.<br>Nicholas L. Nybo, Esq. |